**FILED**

NOV 2 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JENNIFER MOY WEST, PH.D.**      )
**11816 BROOKVILLE LANDING COURT**      )
**MITCHELLVILLE, MARYLAND 20721,**      )
                      **Plaintiff,**      )
                           )
                           )
**v.**                           )

**HOWARD UNIVERSITY, INC.**      CASE NUMBER  1:06CV02025
**d/b/a HOWARD UNIVERSITY**
**2400 SIXTH STREET, N.W.,**      JUDGE: Richard J. Leon
**WASHINGTON, D.C. 20059,**
                      DECK TYPE: Employment Discrimination

                      DATE STAMP: 11/27/2006
                           )
            **SERVE:**      )
                           )
**H. Patrick Swygert**      )
**President**      )
**Howard University, Inc.**      )
**2400 Sixth Street, N.W.**      )
**Washington, D.C. 20059,**      )
                           )
                 **Defendant.**      )
                           )

## COMPLAINT

PLAINTIFF, JENNIFER MOY WEST, PH.D., by and through counsel,

pursuant to Federal Rules of Civil Procedure 2, et al., and the Local Rules of the

United States District Court for the District of Columbia (LCvR) 1.1, et al.,

hereby files this Complaint for damages and other relief against the Defendant,

Howard University, Inc., d/b/a Howard University, and hereby states, in support,

as follows:

## NATURE OF THE CASE/GENERAL AVERMENTS

1

1.     This case involves claims for breach of contract, bad faith, detrimental reliance, negligence and discrimination by the Plaintiff, Jennifer Moy West, Ph.D., against her former employer, Howard University (also referred to herein as the "University").

2.     Plaintiff Jennifer Moy West was originally hired and appointed for a two(2) year period by the Defendant, Howard University for her position of "Assistant Professor (Probationary-Tenure Track)" in the School of Education, commencing August 2003 and ending May 15, 2005.

3.     Plaintiff was reappointed to that position in 2005.

4.     Plaintiff West was again reappointed to her "Assistant Professor (Probationary-Tenure Track)" position in June 2005 for an additional one (1) year term "effective August 15, 2005 through May 15, 2006" [**EXHIBITS A and B**].

5.     On or about February 10, 2006, Dr. West applied timely for reappointment to her position by submitting a two (2) page letter [**EXHIBIT C**] and a 16-page Application [**EXHIBIT D**] to Dr. Hakim Rashid, Department Chairman.

6.     At no time since her reappointment on June 1st, 2005 **[EXHIBIT A]** was Dr. West informed, advised or notified of non-reappointment to her position until after she hired an attorney, who mailed to the Defendant [**EXHIBIT I**] (including a letter, dated May 18, 2006, with [**EXHIBITS A, B, C, D, E** and **F**]).

7.     On May 29, 2006, counsel for Dr. West received a letter, dated May 25th, 2006, from Richard A. English, Ph.D., Provost and Chief Academic Officer, informing

Dr. West's counsel that his letter was being referred to the Defendant's Office of the General Counsel [**EXHIBIT II**].

8.    To this day, counsel for Dr. West has not heard from Defendant's Office of the General Counsel.

9.    Finally, on or about May 30, 2006, Plaintiff Dr. West received a letter from "R. Saravanabhavan, , Ed.D., Interim Dean" stating "that the provost has approved my recommendation of not to reappoint you as an assistant professor (tenure track) in the Department of Human Development and Psychoeducational Studies" [**EXHIBIT III**].

10.    Pursuant to Howard University Faculty Employment Procedures 2.7.3.3(c) [under "Standards for Notice of Nonreappointment of probationary, Tenure Track, Temporary, and Career Status Appointments"], referring specifically to time of notice requirements, NO NOTICE OF <u>NON</u>REAPPOINTMENT, whatsoever, was given to Dr. West pursuant to Faculty Employment requirements".... at least 12 months (365 calendar days) before the expiration of a probationary or career status appointment after 2 or more years in the institution" [**EXHIBIT E**].

11.    By failing to follow properly its own faculty Handbook, *inter alia*, Defendant Howard University has caused harm and damages to Dr. West, both professionally and personally, resulting, <u>inter alia</u>, in Dr. West's inability to secure appropriate employment.

## JURISDICTION AND VENUE

12.    Jurisdiction over this action is proper before this Court, pursuant to 28 U.S.C.§ 1331(a), e t al.  Plaintiff Jennifer Moy West is a citizen of Maryland; defendant Howard University is a domiciliary of the District of Columbia, and the amount in controversy exceeds $75,000.00

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391, inter alia, since the Defendant, Howard University, is domiciled here and the actions giving rise to the claims occurred in this District.

14.    Plaintiff Jennifer Moy West, Ph.D. ("Dr. West") is a citizen of Maryland. From August 2003 to May 15, 2006, Dr. West served as Assistant Professor (Probationary-Tenure Track) in the Department of Human Development and Psychoeducational Studies of the Howard University School of Education.

15.    Defendant Howard University, Inc., ("Howard University" or the "University") is a private, non-profit corporation created by Act of Congress in 1867.  the University has its principal place of business at 2400-6th Street, N.W., Washington, D.C., operating principally as a non-profit educational institution.

## COUNT I

### (Breach of Contract)

16.    Plaintiff Jennifer Moy West hereby alleges and incorporates by reference as if fully stated herein allegations or averments 1 through 15.

17.     Howard University entered into a lawful contract with Plaintiff West when it employed her, and then re-employed her twice, as an Assistant professor [**EXHIBIT I**].

18.     The terms and conditions of the Howard University Faculty Handbook, as amended from time to time, were expressly and impliedly incorporated into Plaintiff West's employment agreement with the University.

19.     Plaintiff West expressly and impliedly relied upon the University's assurances of compliance with the terms and conditions of the University's Faculty Handbook, inter alia, then in effect when she timely applied for reappointment to her position as Assistant Professor on or about February 10, 2006 [**EXHIBITS C** and **D**].

20.     Having counted upon Plaintiff West's compliance with the terms and conditions of her employment as well as the University Faculty Handbook, Defendant Howard University is now estopped from its non-compliance with the employment contract and terms and conditions of the Howard University Faculty Handbook.

21.     Plaintiff West acted at all times within compliance of her employment contract and the terms and conditions of the University Faculty Handbook.

22.     Howard University did not comply with the terms and conditions of the University Faculty Handbook, nor with its employment contract entered into with Dr. West (please see 10, *supra).*

23.     By failing to properly follow its own Faculty Handbook, inter alia, Defendant Howard University has caused direct and proximate harm and damages to

Plaintiff West, professionally and personally, resulting, <u>inter alia</u>, in Dr. West's inability to secure professional employment.

24.     Despite her good faith efforts to mitigate her damages and re-employ herself, Plaintiff has been unable to secure another appropriate or comparable position due to Defendant's unlawful actions against her.

25.     Howard University breached its contractual obligations to give Plaintiff West "....at least 12 months (365 calendar days)..." notice of her non-reappointment as Assistant Professor [**EXHIBIT E**].

26.     Plaintiff West has been damaged to the extent of her loss of income and other costs, attorneys' fees, and other losses.

**WHEREFORE**, Plaintiff Jennifer Moy West respectfully prays for the following relief from this Honorable Court:

A.     That this Court award her compensatory damages against Defendant Howard University in the amount of $250,000.00, as well as attorneys' fees and other costs;

B.     That this Court award her punitive damages in the amount of $500,000.00;

C.     That this Court award pre-judgment and post-judgment interest at the lawful rate; and

C.     That this Court grant Plaintiff West such other and further legal and equitable relief as may be appropriate or proper under all of the circumstances of this case.

## COUNT II

### (Tortious Bad Faith)

27.     Plaintiff Jennifer Moy West hereby alleges and incorporates by reference as if fully stated herein allegations or averments 1 through 26.

28.     Defendant Howard University had a duty to Plaintiff West to act in good faith and to deal fairly with Plaintiff West with respect or regard to its obligation to follow its own Faculty Handbook concerning non-reappointment.

29.     Defendant Howard University breached its duty of good faith and fair dealing by its bad faith refusal to honor its obligation to follow the terms and conditions of the Howard University Faculty Handbook, because the University lacked a reasonable basis for refusing to follow its own Faculty Handbook, and knew of or recklessly disregarded its lack of reasonable basis when it did not comply with the terms and conditions of the Faculty Handbook.

30.     Plaintiff West has been damaged by Defendant Howard University's unlawfulness to the extent of at least $250,000.00 in compensatory damages.

31.     Defendant Howard University's actions (or inaction) were wanton, malicious and in reckless disregard for Plaintiff West's rights, and therefore warrant punitive damages in the amount of at least $500,000.00.

## COUNT III

**(Detrimental Reliance)**

32.    Plaintiff Jennifer Moy West hereby alleges and incorporates by reference as if fully stated herein allegations or averments 1 through 31.

33.    By failing to properly follow its Faculty Handbook, while at the same requiring Plaintiff West to follow the Handbook, Defendant Howard University directly and proximately caused Plaintiff West to rely to her detriment with respect to her future employment as a teacher at the University.

34.    Under the circumstances presented and created by Defendant, Plaintiff West reasonably expected that she would be re-employed or that her employment would be continued for at least one (1) more year at the University.

35.    Plaintiff West relied to her detriment on this reasonable expectation, and she has suffered damages as a direct and proximate result; including compensatory ($250,000.00) as well as punitive ($500,000.00) damages.

## COUNT IV

**(Negligence)**

36.    Plaintiff Jennifer Moy West hereby alleges and incorporates by reference as if fully stated herein allegations or averments 1 through 35.

37.    Defendant Howard University owed a duty of care to Plaintiff West to conform to the terms and conditions of the Faculty Handbook, so that Plaintiff could

avail herself of the faculty market place and seek new employment if and/or when given proper, lawful, and appropriate notice of her non-reappointment by Defendant.

38.    Defendant Howard University breached that duty of care to Plaintiff West.

39.    Plaintiff has suffered actual losses, harm or damage from the unlawful conduct or failure to act of the Defendant.

40.    The losses and injuries suffered by Plaintiff West resulted directly and proximately from Defendant Howard University's breach of its duty to the Plaintiff; including compensatory damages of $250,000.00 and punitive damages of $500,000.00.

## COUNT V

### (Discrimination)

41.    Plaintiff Jennifer Moy West hereby alleges and incorporates by reference as if fully stated herein allegations or averments 1 through 40.

42.    Plaintiff Jennifer Moy West was single (never married), female, African-American, and the mother of an adopted daughter, born August 6, 2002; Imani Grace West.

43.    Defendant Howard University has always been aware of these facts, 42 *supra*.

44.    Plaintiff West believes, and the evidence supports her belief, that Howard University has discriminated against her by its actions, supra, because of her status as an unmarried (single) mother of a minor child during her probationary faculty period with Defendant, (See, in support, **EXHIBITS IV** and **V**).

**WHEREFORE**, Plaintiff Jennifer Moy West respectfully prays for the following relief from this Honorable Court:

A.    That this Court award her compensatory damages against Defendant Howard University in the amount of $250,000.00, as well as attorneys' fees and other costs;

B.    That this Court award her punitive damages in the amount of $500,000.00;

C.    That this Court award pre-judgment and post-judgment interest at the lawful rate; and

C.    That this Court grant Plaintiff West such other and further legal and equitable relief as may be appropriate or proper under all of the circumstances of this case.

Respectfully submitted,
**JENNIFER MOY WEST, PH.D.**
Plaintiff

*Jennifer Moy West, Ph.D.*
Jennifer Moy West, Ph.D.
Plaintiff

By: *Charles Jerome Ware*
Charles Jerome Ware, P.A., Esquire
Attorneys & Counsellors
10630 Little Patuxent Parkway
Suite 113
Columbia, Maryland 21044
Ph: 410-730-5016
Fax: 410-730-7603
Email:CharlesJeromeWare@MSN.com

10

## DEMAND FOR JURY TRIAL

Plaintiff Jennifer Moy West, Ph.D., respectfully demands a jury trial on all issues in this case.

11·01-06

Charles Jerome Ware, Esquire

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

**I (a) PLAINTIFFS**

JENNIFER MOY WEST, PH.D.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

Prince George's County, MARYLAND

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

CHARLES JEROME WARE, P.A., ESQ.
10630 Little Patuxent Pkwy., Ste. 113
COLUMBIA, MARYLAND 21044
(410) 730-

**DEFENDANTS**

HOWARD UNIVERSITY, INC.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____

CASE NUMBER   1:06CV02025

JUDGE:  Richard J. Leon

DECK TYPE:  Employment Discrimination

DATE STAMP:  11/27/2006

**III CITIZENSHIP OF PRINCIPAL PARTIES**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IGNMENT AND NATURE OF SUIT**
resents your cause of action and **one** in a corresponding Nature of Suit)

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**e General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| G. *Habeas Corpus/ 2255*<br>□ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | H. *Employment Discrimination*<br>442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ I. *FOIA/PRIVACY ACT*<br>□ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | □ J. *Student Loan*<br>□ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| K. *Labor/ERISA (non-employment)*<br>□ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | L. *Other Civil Rights (non-employment)*<br>□ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | M. *Contract*<br>□ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | N. *Three-Judge Court*<br>□ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

| ☒ 1 Original Proceeding | □ 2 Removed from State Court | □ 3 Remanded from Appellate Court | □ 4 Reinstated or Reopened | □ 5 Transferred from another district (specify) | □ Multi district Litigation | □ 7Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*Breach of Employment Contract*

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS □ ACTION UNDER F.R.C.P. 23    **DEMAND $** $750,000.00    Check YES only if demanded in complaint **JURY DEMAND:** ☒ YES    □ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    □ YES  ☒ NO    If yes, please complete related case form.

DATE 11/01/06    ✓SIGNATURE OF ATTORNEY OF RECORD    *Charles Jerome Ware*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the basis of jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

RECEIVED

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



# Charles Jerome Ware
## Attorneys & Counsellors at Law
www.charlesjeromeware.com

**PRIORITY MAIL**
UNITED STATES POSTAL SERVICE

additional offices at

**EXHIBIT I**

2910 Neilson Way
Suite 312
Santa Monica, CA

## VIA PRIORITY MAIL

May 18, 2006

Dr. Richard A. English
Provost and Chief Academic Officer
Howard University
2400 Sixth Street, NW
Washington, DC  20059

**RE:  Dr. Jennifer Moy West,**
**Assistant Professor, Department of Human**
**Development and Psychoeducational Studies**

Dear  Dr. English:

I am writing to you on behalf of Dr. Jennifer Moy West, an Assistant Professor in Howard University's Department of Human Development and Psychoeducational Studies since August 16, 2003.

Dr. West, as you know, was reappointed to her "Assistant Professor (Probationary-Tenure Track)" position in June 2005 for an additional one (1) year term "effective August 15, 2005 through May 15, 2006" [**Exhibits A and B**].

On or about February 10, 2006, Dr. West applied timely for reappointment to her position by submitting a two (2)-page letter [**Exhibit C**] and a 16-page Application [**Exhibit D**] to Dr. Hakim Rashid, Department Chairman.  At no time since her reappointment on June 1st 2005 [**Exhibit A**] has Dr. West been informed, advised or notified of non-reappointment to her position.

**Century Plaza Building**
**10630 Little Patuxent Parkway, Suite 113**
**Columbia, Maryland 21044**
**(410) 730-5016**
**(410) 730-7603 Fax**

**Dr. Richard A. English**
**Provost and Chief Academic Office**
**Page 2**

_____  _____

Further, pursuant to Howard University Faculty Employment Procedures 2.7.3.3 (c)
[under "Standards for Notice of Nonreappointment of Probationary, Tenure Track,
Temporary, and Career Status Appointments"], referring specifically to time of notice
requirements, NO NOTICE OF <u>NONREAPPOINTMENT</u>, whatsoever, has been given to
Dr. West pursuant to Faculty Employment requirements " ... at least 12 months (365
calendar days) before the expiration of a probationary or career status appointment after 2
or more years in the institution" [**Exhibit E**].

    If she is not reappointed to her position of Assistant Professor for another year (2006-
2007) by Howard University, Dr. West's career will clearly suffer irreparably and
unnecessarily, and she will be further damaged by her resulting inability to secure
appropriate employment at this late date due to Howard's direct and proximate unlawful
actions, or failures to act regarding her requested continued employment at the
University.

    Dr. West has recently signed a contract (after my review and approval) with the
Association for Supervision and Curriculum Development (ASCD) to publish her book,
titled tentatively "<u>The Holistic Learner Framework:  Accelerating the Academic
Achievement of Low-Performing Students from Marginalized Ethnic and Socioeconomic
Groups</u>" [**Exhibit F**].  Her preference is to continue as Assistant Professor at Howard
University while the book is being printed, published and marketed later this year (2006-
2007).  Such a scenario, I believe, would be mutually beneficial to both Howard
University and to Dr. West.  However, should the University choose not to reappointment
Dr. West to another year of teaching, under the circumstances presented we respectfully
request at least one (1) full year of salary and benefits for her, effective immediately.

    Since much time has been lost and damages suffered by Dr. West because of the
University's unlawful actions and/or unlawful inaction, we need to resolve this matter
quickly if it is to be done amicably.  We are, therefore, requesting that you respond
positively to us within twelve (12) days; by May 31st, 2006.

    Thanking you, in advance, for your anticipated courtesy, attention and cooperation, I
remain,

          Very truly yours,

Charles Jerome Ware, P.A., Esquire

**U.S. Postal Service Delivery Confirmation Receipt**

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)

*(Please Print Clearly)*

Dr. Richard English

20059

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries:
Access internet web site at
*www.usps.com* ®
or call 1-800-222-1811

*DELIVERY CONFIRMATION NUMBER:*
0306 0320 0004 0788 7367

COLUMBIA, MD 210
Postmark Here
MAY 22 2006
USPS

**CHECK ONE (POSTAL USE ONLY)**
[X] Priority Mail™ Service
[ ] First-Class Mail® parcel
[ ] Package Services parcel
(See Reverse)

PS Form 152, May 2002

---

```
         USPS, Columbia MPO
          Columbia, Maryland
              210459998
           2303830245-0090
5/22/2006   (800)275-8777      05:27:11 PM

========= Sales Receipt =========
roduct        Sale   Unit       Final
escription    Qty    Price      Price

OWIE MD 20721                   $1.59
irst-Class
5.60 oz.
                               ========
        Issue PVI:              $1.59

ASHINGTON DC 20059              $4.05
riority Mail
8.80 oz.
  Delivery Confirmation         $0.50
  Label #:     03060320000407887367
                               ========
        Issue PVI:              $4.55

9c H           20    $0.39      $7.80
cDaniel PSA
                               --------
otal:                          $13.94

aid by:
ash                            $20.00
hange Due:                     -$6.06

rder stamps at USPS.com/shop or call
-800-Stamp24.  Go to
SPS.com/clicknship to print shipping
abels with postage.  For other
nformation call 1-800-ASK-USPS.
ill#: 1001002001797
lerk: 06

-- All sales final on stamps and postage. --
   Refunds for guaranteed services only.
       Thank you for your business.
             Customer Copy
```

# HOWARD UNIVERSITY

SCHOOL OF EDUCATION
OFFICE OF THE DEAN

June 1, 2005



Dr. Jennifer West
11816 Brooksville Landing Court
Mitchellville, Maryland 20721

Dear Dr. West:

I am writing to inform you that I have recommended to the Provost your reappointment as an Assistant Professor (Probationary - Tenure Track) in the Department of Human Development and Psychoeducational Studies. Please know that only the President of the University has the authority to make this appointment. I have recommended the following:

> "That Dr. Jennifer West be reappointed as Assistant Professor (Probationary - Tenure Track) in the Department of Human Development and Psychoeducational Studies, School of Education, Howard University beginning August 15, 2005 and terminating automatically on May 15, 2006, at the academic year salary of $56,100."

While your performance in teaching has been satisfactory, evaluation of research and publications ranks below average. In the last two years, you have no evidence of publications. However, you have indicated that several articles are under review or preparation. Considering this, I have recommended your reappointment for one academic year. I hope you will have published at least two referenced articles in School Psychology area by the time you apply for reappointment during 2005-2006 academic year. As stated above, the term of your current reappointment ends on May 15, 2006. There should be no assumption on your part of approval of reappointment to another probationary term.

If you are in agreement with the terms of the offer that I have recommended, please sign below and return a copy of this letter to me by **June 15, 2005**. You may fax your response to (202) 806-5302.

Sincerely,

Vinetta C. Jones, Ph.D.
Dean

cc:    Dr. Richard A. English, Provost and Chief Academic Officer
       Dr. Hakim Rashid, Chair
       Department of Human Development and Psychoeducational Studies

ACCEPTED: _Jennifer West_                    DATE: _6/15/05_

2441 Fourth Street, NW
Washington, DC 20059

(202) 806-7340
Fax (202) 806-7018



## JUSTIFICATION

This personnel recommendation is submitted to reappoint Dr. Jennifer West the position of Assistant Professor under "probationary" status in the School of Education, Department of Human Development and Psychoeducational Studies, effective August 15, 2005 through May 15, 2006.

Employment History:

August 16, 2003-May 15, 2005   Assistant Professor (Probationary)     Dept. of Curriculum and Instruction

11816 Brookeville Landing Ct
Mitchellville,MD 20721

February 10, 2006

**EXHIBIT**
*C*
*West*

Dr. Hakim Rashid, Department Chair
Howard University, School of Education
Department of Human Development and Psychoeducational Studies
2441 Fourth Street, NW
Washington,DC 20059

Dear Dr. Rashid,

Attached is my application for reappointment as an Assistant Professor in the Urban
School Psychology Program. This application details my activities over the past 5
months since my last reappointment on August 15, 2005. I would like to provide you
with an overview of these experiences as a precursor to your reviewing the application.
Over the summer of 2005, I worked on a book intended for publication entitled "The
Holistic Learner Framework: A Structure for Accelerating the Academic Achievement of
Low Performing Students from Marginalized Ethnic and Socioeconomic Groups. In.
November, 2005 I submitted the book proposal and sample chapters to the director of
book acquisitions and development at The Association for Supervision and Curriculum
Development (ASCD). Two weeks after submitting the book I received both a verbal
and written response that indicated ASCD's desire to publish my book. Overall the
review committee had favorable comments but wanted me to incorporate some changes
to make the book more practical for their audiences. Taking all of this into consideration,
I addressed their suggestions and turned in the final copy of the materials this month.
Other activities in the research and publication area have included the following:

1. Collaborated with Dr. Rashid on an article entitled "Educational Transitions:
   A Review and Examination of their Role in the Lives of Students Placed at
   Risk."
2. Collaborating with Dr. Reed to submit, by June 1, an article for publication on
   Urban School Psychology in the Encyclopedia for Cross-Cultural Psychology.
3. Working on several other entries (independently and with students) in
   response to an invitation to contribute to the Encyclopedia of Cross-Cultural
   School Psychology. These papers will be published by Springer, the
   international publishing house, in 2007.
4. Collaborating with Dr. Ferguson and Mrs. Ishmel on a project at the Howard
   University Early Learning Program. We hope to operationalize the program's
   best practices for developing high academic behaviors among urban
   preschoolers and kindergarten students.

A major percentage of my time over the past 5 months has been spent helping to improve
the Urban School Psychology Program. As you are aware, our school psychology
program has not been accredited in over 10 years, and has been functioning below all

school psychology accreditation and certification standards. Because of this situation, the program has suffered a serious credibility problem with our national and local school psychology associations as well as with the school systems in DC, MD and VA areas. Consequently, the school psychology faculty has been fervently working to revamp the program by proposing a new degree program required for minimal entry into the professional field, developing new courses and new curricula schemes for the proposed Ed.S. and Ph.D. degree programs, and completing self-studies for both NASP and APA. I have collaborated with the school psychology faculty on all of the aforementioned tasks and in compliance with the self-study I have spent considerable time restructuring our field-based experiences (practicum and internship). Also, due to our credibility problems I have had to do a great deal of visiting with local school systems to market our program and create opportunities for our students to do their practicums and internships. Finally, a major part of revamping the program has involved working directly with students to help them: 1) adjust and overcome the consequences of matriculating in a program that is not accredited; 2) develop a professional persona for their field-based experiences; 3) become involved with school psychology student associations; 4) become student representatives on state and national school psychology boards; and 5) prepare portfolios that make them marketable.

Dr. Rashid, in addition to these types of the activities I have continued my school of education service work by participating on the Assessment Committee, the Academic Standards Committee, the Graduation Committee and serving as the faculty sponsor for the School Psychology Student Association. In addition, I have attended the new faculty monthly meetings with the Dean and joined Dr. Irvine's faculty research group to help me with publishing. Finally, in an effort to improve the school psychology testing lab, I collaborated with Dr. Reed in applying for the Funds for Academic Excellence Grant.

Dr. Rashid, as you know the transition from 15 years as a practitioner in the schools to assuming the responsibilities of an Assistant Professor has been challenging. Nevertheless, I am finally settling into my role as an academician and my experiences have been professionally rewarding. I have a strong desire to help our program become accredited and become the premier Urban School Psychology Program. I hope that you and the reappointment committee are able to see my growth as an academician and will provide me with a continued opportunity to build the program and my professional career.

Sincerely,

/S/

Jennifer West, Ph.D.
Assistant Professor
Howard University

| FOR OFFICE USE ONLY | |
| --- | --- |
| Fiscal Year | Recommendation Number |

**Application**

**Section 1**



Section 1 is to be initiated by the candidate, who will give the completed form to the department chairman.

Date February 10, 2006

1. Name of Candidate ____West____ ____Jennifer____ ____Moy____
                               Last                      First                      Middle

2. Proposed Rank ____Assistant Professor____

3. School or College _School of Education_

4. Department _Human Development and Psychoeducational Studies_

5. Home Address _11816 Brookeville Landing Court  Mitchellville,MD 20721_

6. Home Telephone Number: (Area Code) __301__ - __390-4552__

7. Business Telephone Number: (Area Code) __202__ - __806-7350__

8. Citizenship ____United States____       Immigration Status _____

9. Social Security Number 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

10. Education (College and University)
    List all institutions attended. (Begin with the most recent)

| Name and Location of Institution | Years Attended | | Major | Degree Received | Date of Degree |
| --- | --- | --- | --- | --- | --- |
| | From | To | | | |
| University of Michigan | 1982 | 1987 | School Psych | Ph.D. | May, 1987 |
| Towson State University | 1980 | 1982 | Clinical Psych | M.A. | May, 1982 |
| Howard University | 1975 | 1979 | Psychology | B.S. | May, 1979 |

11

11. Applicants should request that official transcripts for the highest degree earned be sent directly to the respective department chairman at Howard University.

12. Title of Master's Thesis _____

_____

_____

13. Title of Doctoral Dissertation <u>Clarifying the Parental Role in Helping Black Youth Make A Successful</u>

<u>Transition from Adolescence to Adulthood</u> _____

_____

14. Employment History (Begin with the most recent.)

| Position Held | Place of Employment | Address | From | To |
|---|---|---|---|---|
| Assistant Professor | Howard University | School of Education , 2441 4th Street, Washington, DC 20059 | 8/2003 | Present |
| Psychologist for Achievement Equity | Howard County Public School System | 10810 Route 108, Ellicott City, MD | 1996 | 2003 |
| Human Relations Associate | Howard County Public School System | 10810 Route 108 , Ellicott City, MD | 1993 | 1996 |
| School Psych. | Howard County Public School System | 10810 Route 108, Ellicott City, MD | 1987 | 1993 |

|  |  |  |  |  |
|--|--|--|--|--|
|  |  |  |  |  |
|  |  |  |  |  |

15. Outside References

(List the names and addresses of three references. At least two of these should be professional references. For recent recipients of the master's or doctoral degree, one of these references should be the chairman of the thesis or dissertation committee. Letters appraising the applicant should be sent directly to the department chairman.)

Dr. Barbara Dezmon

Mrs. Barbara Allen

~~Mrs. Sandra Erikson~~

16. Honors, Awards, and Other Distinctions (Begin with the most recent.)

Howard University Performance Award  (2004)

American Psychological Association Minority Fellowship Program  7th Annual Achievement Award for Innovations in Treatment (1995)

Phi Beta Kappa National Honor Society (1979)

Psi Chi, National Psychology Honor Society (1977)

17. Memberships and Offices in Learned or Professional Societies
National Association of School Psychologists
National Black Child Development Institute
Association for Supervision and Curriculum Development

18. Publications
(List sequentially all publications submitted with this form, giving complete reference data and co-authors. Assign a number to each publication and affix the number to the reprint or copy of the publication submitted with the application.)
**A.**
**Articles Published:**

(1) Refereed:

13

1. West, J.M. & Brown, J.F. (1995). *MASSI: A Framework for Achievement Through Diversity*. <u>African American Research Perspectives.</u> Program for Research on Black Americans, Institute for Social Research, The University of Michigan, Ann Arbor, MI.

2. West, J.M. (1988).*Facilitating a Positive Self-Identity: An Investigation of Parental Influence on Black Youths Sense of Personal Efficacy*. In Algea Harrison, (Ed.), <u>Eleventh Conference on Empirical Research in Black Psychology,</u> National Institute of Mental Health.

**Articles Submitted for Publication:**
Rashid, H. & West, J . (2006). Educational Transitions: A Review and Examination of Their Role in the Lives of Students Placed at Risk. *Psychology in the Schools*

**Articles in Process:**
1. Dr. Gregory Reed and I will be collaborating on an Urban School Psychology article to be submitted to the Encyclopedia of Cross-Cultural School Psychology for their June Issue.
2. Dr. Angela Ferguson and I are collaborating on a project with Mrs. Ishmel at the Howard University Early Learning Program.  This project is focused on identifying, objectifying and publishing the program's best practices for establishing high achievement characteristics among urban preschoolers.
3. Dr. Hakim Rashid and I will be collaborating on an article that focuses on Infusing Culturally and Contextually Appropriate Instruction into the Schooling of Low Performing African American Students.

**B. Book Submitted for Publication:**
West J.M. & Newsome, L. (2006).  <u>The Holistic Learner Framework: A Structure for Accelerating the Academic Achievement of Low Performing Students from Marginalized Ethnic and Scoioeconomic Groups</u>. Association for Supervision and Curriculum Development, Alexandria, VA

**C.  Creative Works**

West, J.M. (2005) Program Manual and Student Handbook: Howard University Urban School Psychology Program.

West, J. M. & Brown, J.F. (1999). Asset Based Education: Philosophical Foundation, Howard County Public School System.

West, J.M. (1994). MASSI: Instructional Planning Guide. Howard County Public School System.

**Practitioner Tools:**
West, J.M. (2001) Student Learner Profile
West, J.M. (1995) Elementary School Level: Student Instructional Preference Booklet
West, J.M. (1995) Secondary School Level: Student Instructional Preference Booklet
West, J.M. & Lewis, J. (2001 My Child is Smart in Many Ways Survey

**Item 19 should be duplicated for each publication.**

19. Appraisal of Publication (State briefly the nature of the contribution of each publication. Attach the publication along with reviews or critiques (not abstracts) if available. Duplicate this page as necessary. If the publications are numerous, they may be grouped into categories and these categories described and evaluated rather than the individual publication.)

Publication No.1    ~~MASSI: A~~ Framework ~~for Achievement Through Diversity~~

Author(s) ~~Jennifer M. West and Jacqueline Brown~~

Published in/by ~~African American Research Perspectives, Program for Research on Black Americans,~~

Institute for Social Research, The University of Michigan

Contribution:

16

Publication No. 2 ~~Facillitating a Positive Self-Identity: An Investigation of~~
Parental Influence on Black Youths Sense of personal Efficacy

Author(s) Jennifer M. West

Published in/by  Algea Harrison, (Ed.), Eleventh Conference on Empirical Research in Black Psychology,
National Institute of Mental Health

Contribution:

Publication No. 3————————Educational Transitions: A Review and Examination of Their
Role in the Lives of Students Placed at Risk.

Author(s) Hakim Rashid and Jennifer West

Published in/by  Psychology in the Schools

Contribution:

20. Patents Held

21. Teaching Experience

18

a.  List below the titles of courses taught, and write a brief description of the course content. If available, attach critiques or evaluations of the courses listed as a supplement to this page.

Consultation in School Psychology (1999 – 2000)
Seminar in Learning and Behavior (1999 – 2000)
Seminar in School Psychology (2003 – 2005)
School Psychology Practicum (2003 – 2005)
School Psychology Internship (2004 – 2005)

b.  List below the titles of dissertations or theses that you are directing or have directed. Indicate doctoral dissertations by "D" and master's thesis by "M", indicate the year of each.

c.  List below the titles of dissertations or theses that you have read as a member of a student's committee. Indicate doctoral dissertation by "D" and master's thesis by "M"; indicate the year of each.

d.  List below contributions to teaching that you consider important (e.g., title and description of published or unpublished instructional material, description of curriculum reorganization, introduction of new courses, awards, or citations for outstanding or extraordinary teaching, etc.). Give date of each contribution.

   * Assisted with the development of the updated Ph.D. curriculum in preparation for
Accreditation of the Urban School Psychology Program. (2005-2006)

   * Updated and developed practicum and internship materials (e.g.., applications, contracts, evaluation forms, pre-practicum and pre-internship request forms, site placement letters, etc.) to align our school psychology program with NASP and APA standards. (2004 -2006)

*Developed the Urban School Psychology Handbook for the proposed specialist degree. (2005)

*Developed a new doctoral level course entitled : "Consultation in Urban School Psychology" (2005)

*Assisted with the development of the proposed Ed.S. curriculum for the Urban School Psychology Program ( 2003 – 2004)

22. Describe your contributions to your field or profession that you be considered as significant professional service. (Panel presentations, speeches, talks at professional meetings, conferences, symposiums, workshops, seminars, etc.)

CONFERENCE PRESENTATIONS
Asset Based Education Summer Learning Project, Third Annual Conference on Culturally Appropriate
   Teaching: The Brilliance Factor, Howard University School of Education, Washington, DC, May,
   2005.

Undoing the Performance Damage of Desegregation: A Framework for Acceleration, NBCDI, Atlanta, GA,
   October, 2002.

Culture Learning and Achievement, Archdiocese of Baltimore, Urban Education Conference, Baltimore, MD, October, 2002 and May, 2001

Sociocultural Implications for Special Education Identification, Maryland State Department of Education Disproportionality Conference, March, 1999

Mediated Learning in the Classroom, NAME Conference, 1988


WORKSHOPS

Baltimore County Public Schools, Summer Curriculum Workshop Keynote Speaker
*The Impact of Culture on Cognition and Learning, April (2004)*

St. Mary's County Public Schools, St. Mary's, MD (audience: teachers)
*What to do when you feel like you're teaching to the wall: a framework for accelerating low performers, March, 2002*


Howard County Public Schools, Ellicott City, Maryland (audiences: teachers, administrators)
*Culture, Learning and Achievement, December, 2001*

Progressive Life Institute, Baltimore City, MD,  (audience: social workers, counselors)
*Exploring the Concept of Multiple Intelligences, March, 2001*
*Understanding the Student as a Learner, November, 2000*

Baltimore County Public Schools, Southwest Area Superintendent's Office (audience: principals)
*The Impact of Culture on Cognition and Learning, April (1999)*

Tacoma Washington Public Schools (audience: teachers, administrators, parents)
*MASSI: An Instructional Planning Framework for Achievement Through Diversity, August, 1999.*


INSERVICES

Maryland State Department of Education, Achievement Initiatives for Maryland's Minority Students Steering Committee
>	*Holistic Learner Framework: A Culturally Responsive Approach to Accelerating Low Performers, 2003*

Chatsworth Elementary School , Baltimore County, MD (audience: teachers, counselors)
>	*Motivating Reluctant Learners, January, 2000*
>	*Instructional Planning Utilizing the Student as Learner Profiles, December, 1999*
>	*Asset Based Education: Developing Student as Learner Profiles, November, 1999.*
>	*Culture Informs Cognition, November, 1999.*

Howard County Public Schools, Ellicott City, Maryland (audience: teacher, administrators)
>	*Holistic Learner Framework: Accelerating the Achievement of Low Performers, 2002*
>	*Culture, Learning and Achievement, December, 2001*
>	*Addressing Data Patterns: Culture and Cognition, February, 2000*
>	*Piecing the Puzzle Together to Accelerate Student Achievement, October, 2000.*

20

*Mediated Learning in the Classroom, October, 1998, & January, 1999.*
*MASSI: An Instructional Planning Framework for Achievement Through Diversity, 1994*

23. Research

    a.   Grants for Which You Have Applied

| Project Title | Source | Amount | Period |
|---|---|---|---|
| The Funds for Academic Excellence | Howard University Internal Grant | $ 5,000 | 2006 – 2007 |
| Holistic Learner Framework | Howard University New Faculty Start-up Grant | $75,000 | 2004-2006 |

    b.  Funded Grants

| Name of Grant | Source | Amount | Period |
|---|---|---|---|
| New Faculty Start-up Grant | Howard University | $75,000 | 2004 - 2006 |

c. Other Research
  1. Effective techniques for accelerating the academic achievement of marginalized student subgroups
  2. An examination of practices that facilitate the development of academic identity and a positive academic self-concept among urban preschoolers

d. Impact of Research
  1. This research will provide a theoretical and researched based holistic acceleration framework to be used by educators attempting to accelerate the academic performance of students who are performing 2 or more years below grade level expectations.
  2. This research will allow us to operationalize psychological concepts--- such as, self-regulation, self-esteem, and self-efficacy--- that contribute to high academic achievement among preschool students.

24. Professional Development

Seminars, Courses, Meetings, and Workshops Attended

| Title | Place | Date |
|---|---|---|
| Gloria Ladson Billings | University of Maryland Institute for Urban Education | February, 2006 |
| New Faculty Meetings with the Dean | Howard University | August 2005 – Present (Monthly) |
| Dr. Irvine's Faculty Research Group Meetings | Howard University | Monthly |
| Center for Academic Reinforement Brown Bag | Howard University | Monthly |
| 4th Annual Culturally Appropriate Teaching Conference | Howard University | April, 2005 |
| Contextually "Appropriate Evaluations Brown Bag | Howard University | March, 2004 |

| | | |
|---|---|---|
| 3rd Annual Culturally Appropriate Teaching Conference | Howard University | February 2004 |
| WISC IV Training | Howard County Public Schools | October, 2003 |
| Identifying IQ by Using Alternative Methods to the Discrepancy Theory | District of Columbia Public Schools | February, 2004 |
| Banner 4 Training | Howard University | October, 2004 |
| Brown at 50 lectures | Howard University | May, 2004 |



25. List below departmental, school, or University committees on which you have served, the dates of committee membership, and you contribution to each committee.

Member, School of Education Academic Standards Committee 2003 - 2005
Member, School of Education Assessment Committee 2003 - 2005
Member, School Psychology Faculty Search Committee 2003 - 2004
Member, Educational Psychology Faculty Search Committee 2004 – 2005
Member, Special Grievance Task Force
Member, School Psychology Accreditation Committee
Sponsor, Urban School Psychology Student Association 2003 – 2005
Proctor, School of Education Preliminary and Comprehensive Examinations (2003 – 2006)


26. Public and Community Service

| Activity | Organization | Year |
|---|---|---|
| Consultant, Office of Special Education Reform | District of Columbia Public Schools | 2003 – 2004 |
| Application Reviewer | American Psychological Association Minority Fellowship Review Committee | 2003 – 2006 |
| Report Reviewer | American Psychological Association Task Force on Urban Psychology | 2004 |
| Journal Reviewer | National Alliance of Black School Educators Journal | 2004 - 2005 |
| Member | Maryland State Department of | 2003 – Present |

| | | |
|---|---|---|
| | Education's Achievement Initiatives for Maryland's Minority Students Steering Committee | |
| Member | School Psychology Leadership Committee | 2003 – 2006 |
| Member | Maryland School Psychology Association Board | 2003 - 2005 |

Contribution of Your Services:  Since making the transition into academia I have spent a great deal of my time trying to bring the Urban School Psychology Program up to NASP and APA standards.  Howard's School Psychology program has been out of compliance with these standards for over 10 years- so this is a tremendous task.   The current School Psychology faculty anticipates applying for APA accreditation by next Fall. A major part of my responsibilities has been to re-establish the programs reputation and credibility among school systems and school psychology associations in the DC-Maryland area, in an effort to find placements for our practicum and internship students.  This requires doing a lot of site visits, attending meetings that will give me an opportunity to market out program and discuss the changes that have and continue to take place, and preparing our students to represent themselves , and the program, in a confident and professional manner. I have involved many of our doctoral level students in the local, regional and national school psychology associations in an effort to increase our visibility and let these associations experience the importance of having participants with an expertise in Urban School Psychology.  The process of bringing Howard's Urban School Psychology Program up to standards and re-establishing our credibility has be very time consuming and has to date created an imbalance in how I have divided my time among my

research and other professional responsibilities. However, if we are able to do this Howard will have the only accredited Urban School Psychology Program in the country.

_____          /S /
_____

Date                                Signature of Candidate

TERMS AND CONDITIONS OF FACULTY EMPLOYMENT

denied tenure, the date of notification shall be considered to be the date of the terminal appointment. The appointment may be extended until the appeal is complete.

EXHIBIT
E
West

## 2.7.3.2
## Procedures

### 2.7.3.2.1
### Probationary and Career Status Faculty
The procedures, timetable, criteria, and right to appeal a negative decision applicable to probationary tenure track and career status reappointments are the same as those outlined for a recommendation for tenure. (See sections 2.7.4.4, 2.7.4.5, and 2.7.4.6.)

### 2.7.3.2.2
### Temporary Faculty
Recommendations for reappointment are usually initiated by the department chair who shall seek the advice and consent of the department APT Committee. If the chair and committee decide not to recommend reappointment, no recommendation is generated and the matter is closed. If either the chair or the APT Committee recommends reappointment, the chair's recommendation, together with that of the departmental committee, is sent forward with appropriate documentation to the dean. The dean, in turn, obtains the recommendation of the school/college APT Committee, adds his/her recommendation, and forwards the entire file to the vice president. If the proposed reappointment is for a temporary position, the decision of the vice president is final. Temporary appointments pursuant to special contracts require a written justification from the dean indicating why the appointment is necessary and outlining efforts to recruit probationary faculty for the position in question.

### 2.7.3.3
### Standards for Notice of Nonreappointment of Probationary, Tenure Track, Temporary, and Career Status Appointments
Notice of nonreappointment, or of intention not to recommend reappointment, should be given in accordance with the following standards:

(a)   Not later than March 1 of the first academic year of service, if the probationary appointment expires at the end of that year; or if a 1-year appointment terminates during an academic year, at least 3 months (90 calendar days) in advance of its termination.

(b)   Not later than December 15 of the second academic year of service, if the probationary appointment expires at the end of that year; or if an initial 2-year appointment terminates during an academic year, at least 6 months (180 calendar days) in advance of its termination.

(c)    At least 12 months (365 calendar days) before the expiration of a probationary or career status appointment after 2 or more years in the institution.

(d)    After 2 or more years at the university, full-time temporary faculty are entitled to receive a notice of nonreappointment at least 3 months in advance of termination.

(e)    Failure to provide timely notification of nonreappointment shall entitle the probationary faculty member to a temporary appointment limited to either one academic semester for notice periods of 90 or 180 calendar days, or one academic year for a notice period of 365 calendar days, after expiration of the appointment. Late notice does not entitle the faculty member to tenure or career status by default.

## 2.7.4
## Tenure

### 2.7.4.1
### Purpose of the Tenure System

The protection of the academic freedom of individual faculty members is the instrument by which society at large is protected from hindrances to the search for knowledge and from limits on the dissemination of knowledge. The system of tenure for faculty members is the preeminent means of fostering and protecting academic freedom of the faculty in teaching and in scholarly inquiry.

The tenure system consists of rules and procedures that establish an essentially self-regulated body of scholars enjoying the continuity of existence within which academic freedom is both fostered and protected. The protections of academic freedom are extended to all members of the faculty during their terms of appointment.

The existence of a system of tenure is justified in that it ensures the necessary conditions that allow tenured faculty to achieve and maintain superior quality in their performance of the four major functions of universities in the modern world. These functions are

(a)    The discovery and dissemination of important new knowledge;

(b)    The communication of that knowledge to students and the cultivation in them of the understanding and skills that enable them to engage productively in the further pursuit of knowledge;

(c)    The preparation of students for entry into professions that require for their practice a systematic body of specialized knowledge; and

(d)    Service to the larger community locally, nationally, and internationally.

In intellectual matters, a university faculty is not merely an assemblage of individual scientists, teachers, and scholars; it must possess a corporate life and an



Association for Supervision and Curriculum Development
1703 N. Beauregard Street, Alexandria, VA 22311-1714 (703) 578-9600



## <<DRAFT>> PUBLISHING AGREEMENT

This Publishing Agreement ("Agreement"), effective **DATE** ("Effective Date"), is made between Jennifer Moy West, having an address at 11816 Brookeville Landing Court, Mitchellville, MD 20721, and Lynne P. Newsome, having an address at 10921 Ashland Mill Court, Raleigh, NC 27617 (referred to herein collectively as "Author"), and the Association for Supervision and Curriculum Development ("Publisher" or "ASCD"), having an address at 1703 North Beauregard Street, Alexandria, Virginia 22311-1714, USA.

In consideration of the mutual covenants and promises contained herein, and intending to be legally bound, the parties agree as follows:

## 1. Delivery of Manuscript, Graphics, Permissions, and Other Materials

The Author shall prepare and deliver to the Publisher on or before September 1, 2006 (the "Due Date"), a manuscript acceptable to the Publisher of approximately 40,000 words (the "Manuscript"), provisionally titled "The Holistic Learner Framework: Accelerating the Academic Achievement of Low-Performing Students from Marginalized Ethnic and Socioeconomic Groups." The manuscript shall include:

(a) Two printouts of the completed Manuscript on standard 8 ½" x 11" sheets.

(b) A computer diskette containing the Manuscript in electronic form and organized and presented in accordance with the "Guidelines for Contract Authors of ASCD Books," which is attached to this Agreement as Attachment A and incorporated herein by reference.

(c) Any figures, drawings, charts, diagrams and other material (the "Graphics") intended for inclusion in the Work, prepared in accordance with the guidelines set forth in Attachment A. The Publisher shall have the right to reject such Graphics or require the Author to make reasonable substitutions or amendments as necessary on the grounds of poor quality, excessive cost, or otherwise. Author may submit rough sketches and diagrams for professional rendering by the Publisher.

(d) Any necessary written authorizations and permissions for the use of copyrighted or other proprietary materials (including but not limited to art, illustrations, and photographs), owned by any third party, intended for inclusion in the Work, and any necessary written releases or consents by any person or entity described, quoted, or depicted in the Work (collectively "Permissions"). If the Author does not deliver the Permissions, Publisher shall have the right, but not the obligation, to obtain such Permissions on its own initiative, and Author shall reimburse Publisher for all expenses incurred by Publisher in obtaining such Permissions.

(e) A bibliography, table of contents, foreword, introduction, preface, or similar matter as Publisher may deem necessary for inclusion in the Work.

(f) Author acknowledges and confirms that Publisher shall have no liability of any kind for the loss or destruction of the Manuscript, Graphics, or any other documents or materials provided by Author to Publisher, and agrees to make and maintain copies of all such documents and materials for use in the event of such loss or destruction.

## 2. Termination for Non-Delivery

If the Author fails to deliver the Manuscript, Graphics, Permissions, or other materials required under this Agreement, including revisions and corrections as requested by the Publisher, on the dates designated by the Publisher, or if the Author fails to do so in a form and substance satisfactory to the Publisher, then the Publisher shall have the right to terminate this Agreement by so informing the Author by letter sent by traceable mail to the Author's address as set forth above. Upon termination by the Publisher, the Author shall, without prejudice to any other right or remedy of the Publisher, immediately repay the Publisher any sums previously paid to the Author, and upon such repayment, all rights granted to the Publisher under this Agreement shall revert to the Author.

## 3. Editing and Design

(a) The Author shall fully cooperate with the Publisher and make timely modifications to the Manuscript in accordance with the Publisher's requests, including without limitation those changes required to avoid legal liability. The Publisher shall have the right to edit and revise the Work for any and all uses contemplated under this Agreement, provided that the meaning of the Work is not materially altered. Notwithstanding any editorial changes or revisions by the Publisher, Author's warranties and indemnities under this Agreement shall remain in full force and effect.

(b) While bearing in mind any preferences suggested by the Author, the Publisher shall make all decisions regarding the Work's title and the interior design, format, trim size, colors, and graphic elements.

**4. Proofs**

The Author shall be provided a printout of the manuscript as edited by the Publisher and, upon Publisher's request, any proofs of the Work for the Author's review by a date designated by the Publisher, failing which the Publisher may consider the Work approved for press by the Author.

**5. Index**

If, in the reasonable opinion of the Publisher, an index is required, it shall be prepared by the Publisher at the Publisher's expense.

**6. Publication**

The Publisher shall have the right, at its own expense and with reasonable promptness, to manufacture, distribute, advertise, promote, and publish the Work in a style and manner that Publisher deems appropriate, including typesetting, paper, printing, binding, cover design, imprint, title, and price(s).

**7. Grant of Rights**

(a) The Author hereby grants and assigns to the Publisher, during the term of copyright and all extensions, reissues and renewals thereof, in each country where protected, the full, worldwide, exclusive right to print, publish, and sell the Work, in whole or in part, with or without modification, in any and all editions, languages, media and/or forms now known or hereafter invented.

(b) The Author grants and assigns to the Publisher, during the term of this Agreement, the full and exclusive right to create derivative works and to arrange for the sale, transfer, or licensing throughout the world of the subsidiary rights relating to the Work, including without limitation: foreign translation, abridgment, condensation, digest, anthology, adaptation, syndication, book clubs, hardcover or paperback reprints, slides, recording and any and all other sound reproductions, microfilm, reproduction by any photocopying process, Braille, dramatization, radio, television, motion picture, CD-ROM, or reproduction by other mechanical, electronic/digital means now existing or yet to be devised, or publication outside the United States of editions in English by British or other foreign publishing companies. The proceeds of such sales, transfers or licenses shall be divided as specified in Section 9(c) below.

**8. Copyright**

(a) The Publisher shall register copyright in the Work in the name of the Publisher sufficient to secure United States copyright protection for the Work, and shall print the copyright notice in the Work. The Author promises full cooperation in effecting copyright registration and renewal.

3

(b) If the Publisher enters into any agreement to license any of the subsidiary rights pursuant to Section 9(c) of this Agreement, such agreement shall contain a specific requirement that, to the extent possible, a proper copyright notice shall appear in each copy or ownership of the copyright otherwise be made known.

## 9. Payment to Author

(a) The Publisher agrees to pay the Author 10 percent royalties on gross proceeds from all sales of the Publisher's editions of the Work.

(b) The Publisher agrees to pay the Author ten (10) cents for each book mailed to recipients as a benefit of ASCD membership. Payment will be made within 60 days of publication.

(c) The Publisher agrees to pay the Author 30 percent of net proceeds from the sale, license, or transfer of subsidiary rights in the Work. "Net proceeds" as used in this Section 9(c) shall mean all monies actually received by Publisher less (i) administrative and manufacturing costs, (ii) any commission that may be owed to Publisher's foreign rights licensee, distributor or other third party, and/or (iii) taxes due, other than taxes derived from the Publisher's income.

(d) Royalties shall not be paid on copies distributed at no cost for review or promotional purposes, nor on returns.

(e) The Publisher agrees to pay the Author an advance on royalties of two thousand dollars ($2,000), half of which is payable upon Author's signing of this Agreement and half upon first publication of the Work.

(f) The Publisher shall make royalty payments to the Author twice each year beginning six months from the date of first publication of the Work; provided, however, the Publisher reserves the right to withhold royalty payments to the Author to the extent that the Author has accrued debt to the Publisher for any goods or services.

(g) All royalty and other payments shall be divided as follows: 60% to Jennifer Moy West and 40% to Lynne P. Newsome.

## 10. Author Copies and Discount

The Publisher shall provide the Author with ten free copies of each edition of the Work published by the Publisher, and the Author may purchase additional copies at a 40 percent discount off the nonmember, list price of each edition of the Work. The Author shall not resell or otherwise commercially transfer any copy of the Work provided by the Publisher. However, Author and Publisher may negotiate a separate distribution/resale agreement independent of the terms set forth in this Agreement.

## 11. Study Guide

(a) The Author shall have the option of preparing and delivering to Publisher an original Study Guide, based on the content of the Work, to be posted on Publisher's Web site, free of charge, to encourage reader reflection and discussion of the Work. If the Author chooses to exercise this option, the Author agrees to prepare said Study Guide according to the instructions presented in Attachment B herein.

(b) All rights and warranties conveyed and expressed in this Publishing Agreement with regard to the Work shall apply equally to the Study Guide.

(c) Author agrees to accept as compensation 50 copies of the printed Work, which Publisher will ship to Author at Publisher's expense.

## 12. Confidentiality

All information exchanged and furnished to each party in connection with this Agreement, including without limitation the terms and conditions of this Agreement, shall be treated by the receiving party as confidential. Neither party shall use such information for any purpose other than to satisfy its obligations under this Agreement, and neither party shall disclose the other party's information to any third parties without the other party's prior written consent.

## 13. Name and Likeness

The Publisher may use the Author's name, likeness and biographical data on any editions of the Work published by the Publisher and in any advertising, publicity or promotion for the Work and may extend these rights in connection with grants of subsidiary rights in the Work.

## 14. Revision

When, in the sole judgment of the Publisher, the best interests of the Author and the Publisher are served by a revision of the Work, the Author shall revise the Work or supply any new material that may be needed to keep the Work up to date. The revised Work shall be considered the Work for the purposes of this Agreement. In the event of the Author's inability or unwillingness to revise the Work when requested by the Publisher, the Publisher may declare the Work out-of-print.

## 15. Out of Print

Any published format of the Work shall be considered "out-of-print" when, in the judgment of the Publisher, the demand for the Work is not sufficient to render further publication in that format feasible or practical. The Publisher may then dispose of its inventory of books printed on paper or remove the Work from any electronic or Web databases. Declaring the Work out-of-print in one format does not preclude further publication of the Work in another format.

5

### 16. Reversion of Rights

If the Work shall become out of print and unavailable in any and all formats and editions and if no agreement exists between the Publisher and a third party for publication of a sublicensed edition in the English language, then Author may request in writing that all rights revert to the Author. However, any such reversion of rights shall be subject to grants of rights made to third parties prior to the date of the reversion and the right of the Author and the Publisher to participate in the proceeds from such grants.

### 17. Option on Future Work

The Publisher shall have the first opportunity to read and consider for publication the Author's next work suitable for publication as a book, and the Author shall offer to the Publisher for this purpose the same rights and territories as those covered by this Agreement. Such work shall be the subject of a fresh agreement between the Author and the Publisher, on terms that shall be fair and reasonable. If no terms have been agreed for its publication, the Author shall be at liberty to enter into an agreement with another publisher provided that the Author shall not subsequently accept from anyone else terms less favorable than those offered by the Publisher. Publisher shall exercise this option within six weeks of receipt of a complete manuscript or detailed outline.

### 18. Author's Warrant, Legal Remedies

(a) The Author warrants (i) that Author is the sole author of the Work, (ii) that Author is the sole owner of all the rights granted to Publisher, (iii) that Author has not previously assigned, pledged or otherwise encumbered the same, (iv) that Author has the full power to enter into this Agreement and to receive the payments specified hereunder, (v) that the Work does not contain any unlawful matter, (vi) that the Work is original, has not been published before, and is not in the public domain, (vii) that the Work does not contain any libelous matter, does not invade any right of privacy nor infringe upon any statutory or common law copyright, trademark or other proprietary right, and (viii) that any recipe, formula, or instruction contained in the Work is accurate and is not injurious to the reader or user of the Work.

(b) The Author agrees to indemnify and hold harmless the Publisher, its members, and each of its successors, assigns, trustees, officers, directors, employees, agents and representatives from and against all action, causes of action, claims and demands whatsoever (collectively, the "Claims"), and from all costs, damages, expenses, charges, debts and liabilities whatsoever (including attorneys' fees), whether known or unknown, present or future, arising out of or relating to a breach of the warranties provided by the Author in this Agreement. Upon the Publisher's notification of a Claim arising out of or relating to a breach of the warranties provided by the Author in this Agreement, the Publisher may withhold Author's royalty or other payments due under this or another agreement until the Author has fully satisfied its responsibilities under this Section 18. The royalties or other payments owed to the Author may

6

be applied by the Publisher to cover any costs relating to this Section 18 to the extent Author fails to satisfy its obligations under this Section 18.

(c) The Author shall be responsible for any claims made against any third party to which the Publisher grants subsidiary rights to the Work to the same extent as the Author is responsible to Publisher under this Section 18 of the Agreement.

(d) In the event of any Claim based on an alleged violation of any of these warranties, the Publisher shall have the right to defend the same through counsel of its own choosing and the Author shall indemnify the Publisher and any licensee or distributor of the Work against any damages or losses incurred, as well as against the cost of defending any Claims which, if sustained, would constitute a breach of these warranties.

## 19. Waiver of Liability

In no event shall either party be held liable for incidental, special, exemplary, punitive, indirect or consequential damages arising out of its performance or failure to perform under this agreement.

## 20. Timely Response

The Author agrees to sign and return this Agreement to Publisher promptly. Publisher shall interpret Author's failure to return this Agreement within thirty days of the Effective Date of the Agreement, as Author's decision to reject the terms offered herein and shall consider this Agreement to be canceled.

## 21. General

(a) Binding Agreement. This agreement shall be binding on and inure to the benefit of the heirs, executors, administrators, and assigns of both parties; provided, however, that no assignment of this Agreement shall be made by the Author until after acceptance of the Work by the Publisher, and no assignment shall be made by the Publisher until after first publication of the Work. Assignments by either party in accordance with the terms of this Section shall be effective upon due notice in writing to the other party at the address written above, except that neither party shall assign this Agreement without obtaining prior written approval from the other party, not to be unreasonably withheld.

(b) Force Majeure. In the performance of their obligations hereunder, neither party shall be liable for delays caused by wars, civil riots, strikes, labor controversies, fires, hurricanes, acts of God, governmental restrictions, or other circumstances beyond their control.

(c) Applicable Law. State of Virginia Law shall govern this Agreement, without regard to or application of choice of law rules or principles, and courts located in the state of Virginia shall be the exclusive jurisdiction for all disputes arising from or relating to this Agreement.

7

(d) Severability.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(e) Entire Agreement.  This contract is the entire agreement between the parties. It may not be altered, modified, extended, or revised in any way unless such alteration, modification, extension, or revision is in writing, contained in an instrument of comparable formality to the agreement and signed by each of the parties.

(f) Survival.  The following sections shall survive termination of this Agreement: Sections 7 (Grant of Rights), 12 (Confidentiality), 13 (Name and Likeness), 15 (Out of Print), 18 (Author's Warrant), 19 (Waiver of Liability), and 21 (General).

(g) Waiver. Any waiver of the provisions of this Agreement or of a party's rights or remedies under this Agreement must be in writing to be effective.  Failure, neglect, or delay by a party to enforce the provisions of this Agreement or its rights or remedies at any time, will not be construed as a waiver of such party's rights under this Agreement and will not in any way affect the validity of the whole or any part of this Agreement or prejudice such party's right to take subsequent action. No exercise or enforcement by either party of any right or remedy under this Agreement will preclude the enforcement by such party of any other right or remedy under this Agreement or that such party is entitled by law to enforce.

(h) Headings. All section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

(i) Counterparts. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF the parties hereto have duly executed this Agreement as of the day and year first above written.


**ASSOCIATION FOR SUPERVISION
AND CURRICULUM DEVELOPMENT, Publisher**


_____          _____
Michelle Terry, Deputy Executive Director          Date


8

**[AUTHOR]**

_____          _____
Jennifer Moy West                            Date

Social Security Number: [Required by ASCD for payment of royalties]
Country of citizenship: [Required by U.S. Copyright Office]
Date of birth: [For U.S. Copyright Office]

_____          _____
Lynne P. Newsome                            Date

Social Security Number: [Required by ASCD for payment of royalties]
Country of citizenship: [Required by U.S. Copyright Office]
Date of birth: [For U.S. Copyright Office]

9

**Attachment A**

### GUIDELINES FOR CONTRACT AUTHORS OF ASCD BOOKS

These guidelines are intended to help you prepare a manuscript that will be readily acceptable. If you have any questions about anything in these guidelines, please feel free to discuss them with your ASCD development editor or contact Julie Houtz, Director of Book Editing and Production, at 1-800-933-2723, ext. 5706.

### What to Send Us When Your Manuscript Is Ready
### Please use this checklist as a cover sheet for the package you send to ASCD.

_____ A <u>copy of the prospectus</u> you submitted earlier, updated to reflect any changes (for instance, exact word count now that the manuscript is done; current addresses; a new table of contents if chapter titles have changed, and so forth).

_____ Two double-spaced printouts of the finished manuscript (including *all* references), with pages numbered consecutively.

_____ Brief summary of the book (no more than 250 words). We'd may use this summary as the basis for writing the summary that will be printed on the back cover of the book.

_____ Author information: professional title, mailing address, phone and fax numbers, year of birth, citizenship, and, where applicable, social security number (used in filing for cataloging information from Library of Congress)

_____ "About the Author" section. We like to include in our books one to two paragraphs that tell readers what the author does--in essence, showing why the author is qualified to write the book. Information such as professional title, previous publications, and how to reach the author (mailing address; phone number is optional) is usually included.

_____ List of figures, tables, and illustrations (see sample list on next page)

_____ A separate photocopied set of all figures, tables, and illustrations (in addition to the originals included in the manuscript)

_____ **Virus-free** PC-compatible disks (preferably MS Word) containing manuscript files, summary, and author info (please place each figure in its own file).

_____ Details of operating system and software used in creating the disk files (e.g., WordPerfect 6.1 for Windows). Please save files created in graphics programs such as Adobe Illustrator or Aldus Freehand to the program files rather than TIFF or EPS files (to allow for editing and refining during the production process). **Please do not submit**

### PowerPoint files.

_____ Copies of written permissions received for text or illustrations (with required terms); details on permissions still being sought

_____ Note to editor on any special points

_____ List of any missing items and approximate date they will be sent to editor.

Working with your development editor, ASCD staff editors will review your final manuscript prior to formally accepting it. You will be contacted if we see the need for you to do further work on it before it is assigned to an ASCD editor. We will check the disk to make sure it is usable and that the word count is within the range stipulated in this Agreement. We will do a spot check of references to verify that they have been carefully prepared and are complete. And we will confirm that all promised elements of the book have been submitted. Problems in these areas may result in work being postponed. If necessary, we may return the manuscript to you for completion.

## Organization of Your Manuscript

Most ASCD books are divided into chapters and, in very long books, parts. Chapters should be divided into major sections and subsections and labeled with subheads to help readers understand the organization and flow of the content. (Outlining the content early in the writing process will identify redundant sections and any gaps in information or logic.)

## Appendices and Index

If you want to include appendices, place them at the end of the book and give them titles appropriate to their content. If an index is necessary, it will be created by an indexer hired by ASCD. Appendices and indexes take up space that could be devoted to text, so consideration needs to be given to the best use of those pages (especially if you exceed your designated word count).

## Citations for Quoted Material; References and Footnotes

Citations need to be provided for all direct quotations. Every quotation should include the page number(s) on which the quotation appeared in the original publication. Authors are responsible for providing complete publishing information in reference citations. See The Publication Manual of the American Psychological Association, 4th ed. (American Psychological Association 1994) for more information on what constitutes a complete reference.

We use the author-date system of documentation rather than footnotes to identify such source material: sources are cited in the text by the author's last name and the date of publication; a list of complete references appears at the end of the chapter or book. As long as you provide all the

relevant information, we'll take care of styling (we use the style of the American Psychological Association [APA] to format references).

We use footnotes only for information of a parenthetical nature that may be too long to include in the text.

## Figures--Charts, Diagrams, Tables, and Exhibits

Each figure should have a number and a title that describes the content of the figure. All figures should be numbered consecutively within each chapter and cited in the text (i.e., no figure should appear without being discussed in the text and referred to by its figure number). In Chapter 1, numbering should begin with Figure 1.1, 1.2, and so on. Figures in Chapter 2 should proceed from 2.1, 2.2, etc.

Figures should be self-explanatory and clearly rendered in case we need to have them replicated by an artist. Simple tables and charts should be created in the word processing program and saved as regular files (not as images). We prefer that computer-generated graphics be created in Adobe Illustrator or Aldus Freehand and saved as files in that program rather than as TIFF or EPS files, so that we can modify typefaces and edit text. EPS or TIFF files are acceptable for high-quality graphic images that shall not require editing or refinement. Please refer to the section above on preparing your computer disk.

Include a list of all figures, similar to the one below. Finally, keep in mind that figures, photographs, and other artwork increase the cost of producing a book. Please carefully review each graphic element and consider whether it is necessary to the reader's understanding of the topic. Your editor may recommend deleting selected figures or images.

### Sample List of Figures, Tables, and Illustrations

| Figure Number | Figure caption (title) | Is figure On disc? | Is this camera-ready art*? | To be executed for publication by ASCD? |
|---|---|---|---|---|
| 1.1 | 1996 Test Scores of 8th Grade Students | Yes | no | Yes |
| 2.1 | Student's Illustration of the 1968 Riots | no | yes--original student work | No |
| 2.2 | Graphic Organizer Created by the Class | yes | No | No |
|  |  |  |  |  |

*Camera-ready art is generally considered high-quality original artwork that can be photographed by the printer for inclusion in the book (i.e., it is not refined by the designer or typeset to match the rest of the book)

## Permission to Reprint

12

*It is the author's responsibility to ensure that quoted material is accurate and to obtain permission to reprint poetry or song lyrics, lengthy extracts, entire articles, and published figures--any material copyrighted by others.* Because obtaining permissions can take months, sending out permission requests should be a part of your manuscript development and be finished by the time you are ready to submit your final manuscript to ASCD. Remember, if a publisher refuses to let you use material that you have planned to include, you will need time to revise your manuscript accordingly. A sample permission request form is at the end of this Attachment.

To keep track of the status of required permissions, we ask that you prepare a list similar to this and submit it to ASCD along with copies of the permissions received for text or illustrations (with required terms); and details of permissions still being sought.

| Content | Permission Requested From: | Date Requested | Date Received |
|---|---|---|---|
| *Figure 1.1—*<br>*2000 Test Scores of Students* | *ABC Publisher* | *6/12/02* | *8/30/02* |
| *Poem: "Who Am I?" (to be included in chapter 1)* | *John Doe* | *6/15/02* | *7/1/02* |
| *Lengthy excerpt from The UBD Handbook (to be included in chapter 2)* | *ASCD* | *6/20/02* | *6/25/02* |

*Permission forms should be sent to ASCD along with your final manuscript.

13

**Preparing Your Computer Disk**

Preparing your electronic manuscript according to the following guidelines will save much time in editing and production.

    ▪ Create a separate file for the text of each chapter, for figures (charts, tables, diagrams, etc.), and all other separate elements. In other words, don't put your entire book in one large file.

    ▪ Give the files identifying names--for instance, CH1ms (chapter 1 manuscript), CH1fig (chapter 1 figures), AppA (Appendix A), Refs (references), or TOC (Table of Contents).

    ▪ Use capital and lowercase letters (not all capitals) for chapter titles and major heads and subheads. Center level A subheads; put level B subheads flush left and skip a line before starting the text:

1. Chapter Title

    Begin text. Use an easily readable type size (about the same size as 12-point Courier) throughout. Clearly indicate material that is quoted--either by using quotation marks or indenting.

**Level A Subhead**

    Begin text. Use an easily readable type size (about the same size as 12-point Courier) throughout. Clearly indicate material that is quoted--either by using quotation marks or indenting.

**Level B Subhead**

    Begin text. Use an easily readable type size (about the same size as 12-point type Courier) throughout. Clearly indicate material that is quoted--either by using quotation marks or indenting.

    ▪ Remove unnecessary formatting. Before your book can be typeset, all non-essential word processing codes must be stripped out. The less sophisticated your manuscript looks, the easier it will be for us to edit, design, and typeset it. Use one type size throughout.

    ▪ Use just one space following colons and periods at the end of sentences.

Please write on each disk the name and version number of the software used to prepare the files (e.g., WordPerfect 6.1 for Windows, MS Word 4.0 for Mac). <u>Please do not submit PowerPoint files.</u>

14

# Sample Request for Permission to Reprint

ASCD would like permission to reprint the following material from the publication listed below. For your convenience, I have attached a copy of this material. ASCD requests nonexclusive world rights in all languages in all formats, including electronic, for this edition and future editions and revisions including derivative works. These rights will in no way restrict republication of your material in any form by you or others authorized by you. Should you not control these rights, or if additional permission is needed from another source, please indicate whom I should contact.

**Source publication**
Author/Editor:
Book/Periodical Title:
Article Title:
Publication Date: _____ (include month and year for periodicals)    Volume no. _____    Issue no.
Page(s): _____         * text numbering about _____ words       * art, figures, illustration(s)

**Project information**
Draft Title:
Author/Editor:
Publisher: ASCD, 1703 N. Beauregard St., Alexandria, VA 22311-1714. ASCD is a nonprofit, nonpartisan organization of about 160,000 members whose mission is "forging covenants in teaching and learning for the success of all learners."
Purpose:
Target audience: _____ Expected publication date:
Size/no. of pages:

ASCD will cite a standard source line, including complete bibliographical data either adjacent to the passage or on the copyright page. If you have a specific credit line requirement, please attach it to this form.
     A duplicate copy of this form is enclosed for your files. If permission is granted, please sign below and return one copy of this completed form to me at the following address. Thank you for your prompt attention to this matter. I would appreciate your responding to this request by _____. Send to:


Name _____


Address_____


City _____ State _____ Zip Code _____

E-mail _____ Telephone_____

* * *

Permission is granted on the terms stated above. The authorized agent hereby represents that he or she has the right to grant the permission herein and the material does not infringe upon the copyright of others.

Printed name: _____    Date:_____

Signature: _____    Title: _____

15

Attachment B

# How to Prepare an ASCD Book Study Guide

ASCD posts study guides for our books on the ASCD Web site to encourage individual reflection and group discussion of the content of ASCD books. Provided free of charge, study guides can serve as a positive tool for professional development and, when used by school- or district-wide study groups, may result in bulk sales of books.

Here's how to prepare a book study guide:

1. You may model it on one of the guides already on the ASCD Web site at www.ascd.org/StudyGuides. Provide a list of questions for each chapter and, if appropriate, activities for "Extending Your Learning." ASCD will provide an introduction and direct readers to our online store for additional resources on your topic.

2. Limit the word count to 2,000 (no more than 8 pages with 250 words per page). Fewer words are acceptable.

3. Provide the study guide to us on a computer disk with a paper copy. Label the disk with the word processing program you used. Please contact your ASCD editor if you want to submit your study guide electronically via e-mail instead.

Writing a study guide is optional and there is no deadline. We are happy to accept a guide whenever an author finds the time to prepare it. However, the optimal time to post a study guide is when the book is first published. If we receive the guide well in advance of publication, we can print an announcement in the book to direct readers to it.

Although we are not offering our authors monetary compensation for this work, any increase in bulk sales will result in an increase in royalties as well. And we will send you up to 50 additional copies of your book.

Please contact your ASCD book editor if you have any questions.

16



**Preface**
*Robert Joseph Taylor*

**African American Mental Health: Persisting Questions and Paradoxal Findings**
*David R. Williams*

**Mortality Outlook: An Overview of African American Health**
*Chiquita A. Collins*

**Socio-Economic Status of Older Black Americans: Education, Income, Poverty, Political Participation, and Religious Involvement**
*Robert Joseph Taylor & Shirley A. Lockery*

**Family and Church Support Among African American Family Caregivers of Frail Elders**
*Brenda F. McGadney*

**of What Happened to Michigan's General Assistance Recipients**
*Sandra K. Danziger & Sherrie A. Kossoudji*

**Comparative Research on Adolescent Childbearing: Understanding Race Differences**
*Julia Henly*

**Paternal Identity Among Urban Adolescent Male**
*Waldo E. Johnson*

**Parental Practices, Parental Occupation and Children's Aggression**
*Andrew L. Reaves*

**MASSI: A Framework for Achievement Through Diversity**
*Jennifer Moy West & Jacqueline F. Brown*



**Winter 1997
Volume 3, Issue 1**

**The (Mis)Diagnosis of Mental Disorder in African Americans**
*Harold W. Neighbors*

**Motivation vs. Structure: Factors in the Academic Performance of African American College Athletes**
*Robert Sellers & Tabbye Chavous*

**Hate Crimes, Stress and Bigotry in the Late Twentieth Century: Where Are We Headed?**
*Tony Brown*

**Contemporary African American Religion: What Have We Learned From the NSBA?**

**Understanding Marital Decline Among African Americans**
*M. Belinda Tucker & Claudia Mitchell-Kernan*

**Effects of Maternal Employment on Single Black Mothers and Their Young Children: A Longitudin; Study of Current and Former Welfare Recipients**
*Aurora P. Jackson*

**Black Politics, Redistributive Urban Policy and Homelessness**
*Betty Brown-Chappell*

**The Million Man March: Portraits and Attitudes**
*Robert Joseph Taylor & Karen D. Lincoln*

**Voting Rights and the Million Man March: The Problem of Restoration of Voting Rights for Ex-Convicts**
*Hanes Walton, Jr. & Simone Green*

# MASSI: A Framework for Achievement Through Diversity

Jennifer Moy West & Jacqueline F. Brown

Educational systems across the country are being challenged to move from a social order where cultural differences between children and between children and teachers result in academic deficits. The poor academic performance of many "minority" children, across socioeconomic levels, certainly reflects the critical need for the educational movement of Achievement Through Diversity. When the Howard County Public School System's Office of Human Relations conducted a review of research on African American academic achievement, a number of exemplary programs across the country were found to have successfully educated African American students (Ascher, 1991; Bempechat, 1992; Bowers & Flinders, 1991; Comer, 1980; Comer & Haynes, 1991; FulWove, 1990). An analysis of these programs suggested that African American academic achievement resulted when an integrated and systematic approach to academic achievement was utilized.

The research review revealed that exemplary programs tended to be comprehensive in nature and focused on ways to motivate students; to effectively assess the learning and progress of students; to structure the instructional environment to create an optimal learning environment for all students; to utilize internal and external support systems and work with these systems in a collaborative manner; and to utilize effective instructional techniques. Analyses of exemplary programs suggests that when all five of these components are purposefully and simultaneously integrated into a unit and/or lesson plan we have the foundation for a wholistic, integrated educational process that results in achievement for a diversity of student learning needs. MASSI is the acronym for the integrated Motivation, Assessment, Structure, Support, and Instruction framework derived from a review of the work of exemplary programs and teachers.

## African American Academic Achievement

When the MASSI framework is used to design education for African American students, the research suggests a number of considerations:

## Motivation

One of the dimensions of African American culture is its emphasis on affect (Boykin,1986). According to Boykin, African American culture places an "emphasis on emotions and feelings together with a special sensitivity to emotional cues and a tendency to be emotionally expressive." An African American cultural emphasis on affect does not de-emphasize the importance of intellect, but rather implies the complimentary use of both domains in acquiring knowledge (Pasteur & Toldson, 1982). Consequently, many African American children are socialized to be affective learners who value a caring and nurturing teacher-student relationship. Teachers who successfully nurture their relationship with students assume the role of a positive Academic Significant Other. Positive Academic Significant Others can influence the achievement motivation of

African American students in the following ways:

- utilizing an additive approach to teaching that recognizes the indigenous skills students bring with them and attempts to build upon those skills

- utilizing strategies that enhance self-esteem and also promote higher levels of self-efficacy

- recognizing the different forms of educationally inviting and uninviting messages for African American students

- identifying and teaching through students core interest areas

- helping students view themselves as academically able, valuable, and self-directing; consistently and encouragingly state high academic expectations

- give usable and constructive corrective feedback that will encourage continued academic efficacy

- develop a clearly articulated mission in which preparation for higher education is a priority

- incorporate learning about diverse groups, including themselves, across the curriculum

- develop presentations in science, math, language arts, and social studies that are inclusive of African American contributions.

## Assessment

In Achievement Through Diversity, the educator must rephase the following traditional assessment questions. "How smart are you" must be changed to "how are you smart?" "Show me how smart you are (via standardized tests)" must be amended by the offer to "show me what you know in your own way" (Brown, 1992). Because most African American children really do know the answers -- they just don't recognize the question in standardized test format, it is incumbent that demystifying the testing format and language for students become an integral part of the assessment process.

Researchers and educators have concluded that assessments make positive contributions to African American academic achievement when they have clear pedagogical applications (Hilliard, 1982; Hilliard, 1987; Jensen & Feuerstein, 1987; Jensen, 1990). Educational studies indicate that assessments which place emphasis on learning processes over learning outcomes provide teachers with valuable instructional information about what is being learned and what is not being learned and why. Assessments that focus on the process of learning assist teachers in fine tuning the higher order thinking skills African American students need to meet the technological demands that will be required in the work world of the 21st century (Ascher, 1990).

Researchers have suggested that African American students' classroom performances

might be better addressed if educators use the students' indigenous cultural skills as a resource when measuring their academic progress with performance based assessments. For example, African American culture is characterized by an oral tradition or a preference for oral/aural modes of communication in which both speaking and listening are treated as performances. Consequently, oral virtuosity and stylized verbal skills are emphasized and cultivated (Boykin, 1986). Performance based assessments which use oral presentations might provide information about students' levels of understanding that written assessment practices might mask (Gilbert & Gay, 1985; Tharp, 1989).

## Structure

Time is a classroom structural issue that impacts the learning of African American students. The amount of time devoted to a subject appears to serve as a structural indicator of importance to African American students. Research on learning time suggests that effective changes in student achievement can be achieved by: (1) increasing the total amount of time which is allocated to learning; (2) increasing the portion of that allocated time which is actually allowed for leaning; and (3) increasing the amount of this allowed time which pupils actively devote to learning (Hamischfeger and Wiley, 1981). Educational studies and exemplary programs have repeatedly supported this research by demonstrating that adequate instructional time is critical to improving the achievement of African American students (Stein, Leinhardy & Bickel, 1989; Hale-Benson, 1987).

Grouping is another structural factor that has an impact on African American academic achievement. Educators and researchers have consistently reported that African American students excel in heterogeneous academically oriented groups (Hale-Benson, 1987; Fullilove & Treisman, 1990; Ladson-Billings, 1992). Heterogeneous groupings which promote cooperation, sharing and the development of social bonds and responsibilities that transcend individual privileges are closely aligned with the African American cultural dimension of communalism (Boykin, 1986). Educators who allow African American students to interact with others in the mutual construction of knowledge will help them to make better connections with the information. This will result in a type of learning that becomes incorporated by the child and will be experienced by the child in the future as "felt knowledge" (Hanson, 1992).

## Support

A review of the literature on African American achievement suggests that African American students excel when schools develop an organized system of support that includes the following four sources of support working coraboratively to effectively impact African American students academic achievement.

**Parents/Caretakers.** A consistent body of research suggest that the academic achievement of African American children is likely to increase when parents are frequently involved in their children's schooling (Lee, 1985; Sheilds, 1983; Clark, 1983; Franklin & Boyd, 1985; West, 1987; Royal, 1988). Researchers have indicated that maximum support is provided when (1) parents impact both school achievement and educational aspirations; (2) parents are provided with inservices that increase their awareness of the types of academic socialization experiences that influence African

American children's academic achievement -- such as parental school involvement, academic encouragement, firm and consistent monitoring of time and space, a future time orientation, a belief in the education ethic despite widespread evidence of discrimination in the workplace, and survival skills for persevering in environments that may be discriminatory; (3) in-school parent programs and parent outreach programs are created to familiarize parents with the relationship between career opportunities and academic course selection.

**Community.** There are a variety of studies that report the powerful effect that mentors had on the lives of high achieving African American adults (Bempechat, 1992). Along with churches there are sororities, fraternities, and other civic organizations that are available to collaborate with the schools to provide mentoring, role models, and offer tutorial support, social and job training skills. School programs that have been successful in fostering academic excellence among African American students have found creative ways of utilizing these types of community resources to maintain high levels of achievement in their students (Asher, 1991). Exemplary programs have demonstrated that linking with a university child study center, provides powerful resources for helping African American students succeed (Comer & Haynes, 1991). Schools which form partnerships with historically Black colleges and universities establish additional people resources and mentors as well as current research driven educational techniques for helping African American students achieve.

**School Supports.** Exemplary programs have demonstrated that schools are in a better position to serve African American students through the collaborative efforts of school teachers, administrators, psychologist, social workers, guidance counselors, parents and health specialists (Comer & Haynes, 1991).

**Peers.** Peers have a powerful influence on the achievement motivation of African American students. An emerging body of literature reveals that peers who support the development of both ethnic and academic identities help promote academic excellence among African American students. African American students who receive positive academic support from their peers are less likely to adopt an "oppositional frame of reference" which requires them to choose between being smart and alone or being African American and accepted (Fordham & Ogbu, 1986; Fordham, 1988). Other studies have found that peer groups which promote both social and academic identities foster higher levels of achievement (Fuffilove & Treisman, 1990).

## Instruction

Two assumptions underlying research that examines culture and learning are: (1) children do not enter school as "empty vessels" ; and (2) culture does not determine ability but it shapes how it is processed and expressed (Protheroe & Barsdale, 1991; Bowers & Flinders, 1991) Although there is diversity in learning styles among African Americans there is a strong relationship between African American cultural patterns of perceiving and the field-sensitive learning style.

Designing instruction to meet the needs of African American field-sensitive learners can be approached systematically by first setting the stage for learning prior to performing the

task of teaching. There are two phases of stage setting -- a student-initiated phase and a teacher initiated phase. The student initiated phase involves creating a comfortable classroom atmosphere that will help prepare students psychologically for total involvement in the learning process (Howard 1987). The preparation period might include behaviors aimed at establishing social relations with peers and with the teacher. The teacher-initiated phase has three activities (Brown, 1986). Activity one includes helping the students to perceive relevance of the learning tasks to their lifestyles. In the second activity of stage setting, students explore their familiarity with the topic. In other words, showing them what they already know by citing how they actually have used it in their daily lives. The cognitive scheme developed in activity two becomes the mental hook onto which new information can connect. The result is the beginning of activity three which is transition by acquisition. During this phase of stage setting students begin the process of expanding the pre-existing scheme to accept more knowledge of the subject and thus grow cognitively.

## MASSI Pilot Program

The Howard County Public School System in Columbia, MD has begun a pilot of the MASSI framework involving a six-school kindergarten through twelfth grade feeder system. Teachers in the feeder system have received seven sessions of targeted staff development training in the use of the framework. Participants were provided an opportunity to experience the individual elements first hand and to learn more about incorporating the strategies into lessons. A second aspect of the staff development training involved a peer coaching component designed to provide support and encouragement as teachers take MASSI back to their classrooms.

Preliminary evaluation indicates that the MASSI framework is proving to be more than a mechanism for closing the performance gap between African American students and their counterparts. Rather, MASSI is demonstrating efficacy in improving instruction and student performance across various cultural domains.

## References

Ascher, C. (1990). Testing students in urban schools: Current problems and new directions-New York: Teachers College, Columbia University. (ERIC/CUE Trends and Issues, No. 100, ERIC Clearinghouse on Urban Education).

Ascher, C. (1991). School Programs for African-American Male Students. New York: Teachers College, Columbia University. (ERIC/CUE Trends and Issues, No. 15, ERIC Clearinghouse on Urban Education).

Bempechat, J. (1992). Fostering high achievement in African-American children: Home, school, and public policy influences. New York: Teachers College, Columbia University. (ERIC/CUE Trends and Issues, No. 15, ERIC Clearinghouse on Urban Education).

Bowers, C.A., & Fhnders, S.J. (1991). Culturally responsive teaching and supervision: A handbook for staff development. New York, NY: Teachers College Press.

Boykin, W. (1986). The triple quandary and the schooling of Afro-American children. In U. Neisser (Ed.), The school achievement of minority children: new perspectives. Hillsdale, N.J.: Erlbaum.

Braddock, J. H. (1990). Tracking: Implications for student race-ethnic subgroups. Baltimore, MD: The Johns Hopkins University, Center for Research on Effective Schooling for Disadvantage Students.

Brown, J. (1993). Presentation on Cross-Cultural Communication for The Howard County Public School System. Columbia, MD.

Brown, T.J. (1986). Teaching minorities more effectively. Lanham, MD: University Press of America, Inc.

Clark, R. (1983). Family life and school achievement: Why poor Black children succeed and fail. Chicago, ILL: The University of Chicago Press.

Comer, J. (1980). School power: Implications of an intervention project. New York: The Free Press.

Comer J., & Haynes, N. (1991). Meeting the needs of Black children in public schools: A school reform challenge. In C. Wilie, A. Garibaldi & W. Reed (Eds.), The education of African Americans. New York: Auburn House.

Fordham, S. (1988). Racelessness as a factor in Black students' school success: Pragmatic strategy or Pyrrhic victory? Howard Educational Review, 58, 54-84.

Fordham, S., & Ogbu, J. U. (1986). Black students school success: The burden of acting white. The Urban Review, 18, 176-206.

Franklin, A.J., & Boyd-Frankhn, N. (1985). A psychoeducational perspective on Black parenting. In H. Mc Adoo (Ed.), Black Children. Beverly Hills, CA.

Fullilove, F., & Treisman, P.U. (1990). Mathematics achievement among African American undergraduates at the University of California, Berkeley: An evaluation of the Mathematics Workshop Program. Journal of Negro Education, 59, 463-478.

Gilbert, S.E., & Gay, G. (1985). Improving the success in school of poor Black children, Phi Delta Kappan, 67 (2), 133-137.

Griffm, J. (1990). Developing more minority mathematicians and scientists: A new approach. Journal of Negro Education, 59, 424-438.

Hale-Benson, J. (1986). Black children:Their roots, culture, and learning styles (Rev. ed.). Baltimore, MD: The Johns Hopkins University (ED 226077).

Hanson, K. (1 992). Teaching Mathematics effectively and equitable to females. New York: Teachers College, Columbia University. (ERIC/CUE Trends and Issues, No. 17, ERIC Clearinghouse on Urban Education.

Hamischfeger, A., & Wiley, W.E. (1981). Origins of active learning time. (Studies of Education Processes No. 18). Evanston, ILL: Northwestern University.

Hilliard, A.G. (1982). The learning potential assessment device and instrumental enrichment as a paradigm shift. Paper presented at the American Education Research Association Annual Meeting, New York.

Hilliard, A.G. (1987). The ideology of intelligence and I.Q. magic in education. The Negro Educational Review, 38, (2-3), 137-145.

Hill, P., Foster, G., & Gendler, T. (1990). High schools with character. Santa Monica, CA: The Rand Corporation (ED 327 5970).

Howard, B.C. (1987). Learning to persistlpersising to learn: A challenge to teachers. Washington, D.C.: The American University.

Jensen, M.R. (1990). Principal of change models in school psychology and education. Unpublished

manuscript.

Jensen, M.R. & Feuerstein, R. (1987) The learning potential assessment device: from philosophy to practice. In C.F. Lidz (Ed.), Dynamic assessment: an interactional approach to evaluating learning potential. New York: Guilford Press.

Lee, C. (1985). Successful rural Black adolescent: A psychological profile. Adolescence, 20, 129-142.

Pasteur, A.B. (1982). Roots of soul: The psychology of Black expressiveness. New York: Anchor Press/Doubleday.

Protheroe, N.J., & Barsdale, K.J. (1991). Culturally sensitive instruction and student learning. Arlington, VA: Educational Research Service, The Information Source for School Decisions.

Royal, C. (1988). Support systems for students of color in independent schools. In D. Slaughter & D. Johnson (Eds.), Visible now: Blacks in private schools. New York: Greenwood Press.

Shields, P.H. (1983). Influence of parent practices upon the reading achievement of good and poor readers. Journal of Negro Education, 52 (4), 436-445.

Stein, M., Leinhardy, G., & Bickel, W. (1989). Instructional issues for teaching students at risk. In R.E. Slavin, N. L. Karweit & N.A Madden (Eds.), Effective programs for students at risk. Boston, MA: Allyn and Bacon.

Tharp, R.G. (1989). Psychocultural variables and constants: Effects on teaching and learning in schools. American Psychologist, 44(22), 349-359.

West, J.M., (1987). Clarifying the parental role in helping Black youth make a successful transition from adolescence to adulthood. Unpublished doctoral dissertation, The University of Michigan.



# HOWARD
## UNIVERSITY



Office of the Provost and
Chief Academic Officer

May 25, 2006



Mr. Charles Jerome Ware, P.A., Esq.
Century Plaza Building
10630 Little Patuxent Parkway, Suite 113
Columbia, Maryland 21044

**RE: Jennifer Moy West, Ph.D.**

Dear Mr. Ware:

This communication is to acknowledge receipt of your letter dated May 18, 2006. In accordance with University policy, your letter has been referred to the University's Office of the General Counsel. University policy requires that once an office at the University is contacted by a law firm or an attorney representing a party, the matter must be referred to the Office of the General Counsel of the University for a response.

Please be advised that any further communication regarding this subject should be directed to Mrs. Norma B. Leftwich, the General Counsel for Howard University,. The address is 2400 Sixth Street, Northwest, Suite 321, Washington D.C. 20059 and the telephone number is 202-806-2650.

Sincerely,

Richard A. English

Richard A. English, Ph.D.
Provost and Chief Academic Officer

RAE/dak



2400 6th Street, NW, Suite 405
Washington, DC 20059

Telephone 202 806 2550
Facsimile 202 806 4971
www.howard.edu

# HOWARD UNIVERSITY

EXHIBIT
III
West

SCHOOL OF EDUCATION
OFFICE OF THE DEAN

May 26, 2006

Dr. Jennifer West
11816 Brooksville Landing Court
Mitchellville MD 20721

Dear Dr. West:

I write to inform you that the provost has approved my recommendation of not to reappoint you as an assistant professor (tenure track) in the *Department of Human Development and Psychoeducational Studies*.

I wish you the best in your future endeavors.

Sincerely,

Rc Saravanabhavan, Ed.D.
Interim Dean

cc:    Dr. Hakim Rashid, Chair
       *Department of Human Development and Pschoeducational Studies*



American Association of University Professors

# Statement of Principles on Family Responsibilities and Academic Work



EXHIBIT
IV

*The statement that follows was approved in May 2001 by the Association's Committee on the Status of Women in the Academic Profession and its Subcommittee on Academic Work and Family. In June 2001 the Association's Committee A on Academic Freedom and Tenure endorsed the substance of this statement. The committee noted that the statement is a departure from the* <u>1940 Statement of Principles on Academic Freedom and Tenure</u>, *but one that provides an important relief for probationary faculty in their child-rearing years. In November 2001 the AAUP Council adopted this statement as Association Policy.*

In 1974 the Association issued a statement, *Leaves of Absence for Child-Bearing, Child-Rearing, and Family Emergencies*, which presciently called for

> [a]n institution's policies on faculty appointments [to be] sufficiently flexible to permit faculty members to combine family and career responsibilities in the manner best suited to them as professionals and parents. This flexibility requires the availability of such alternatives as longer-term leaves of absence, temporary reductions in workload with no loss of professional status, and retention of full-time affiliation throughout the child-bearing and child-rearing years.

Since 1974 there have been significant demographic and legal changes affecting the academic profession. Notably, the percentage of women faculty has increased: in 1975 women made up 22.5 percent of full-time faculty, while in 2000–01, women constituted 36 percent of full-time faculty, according to the AAUP's Annual Report on the Economic Status of the Profession, known as the "salary survey," which is published in the March–April issue of the Association's journal, *Academe.* Many of the policies promoted in the AAUP's 1974 statement are now federal law, such as the Pregnancy Discrimination Act of 1978, which prohibits discrimination based on pregnancy, and the Family and Medical Leave Act of 1993, which provides for up to twelve weeks of unpaid leave a year for employees (women and men) to care for a newborn or a newly adopted child; to care for a parent, spouse, or child with a serious health condition; or to deal with the employee's own serious health condition. Accordingly, the Committee on the Status of Women in the Academic Profession revisited the 1974 statement to address some of the current issues facing faculty members as they seek to integrate their family obligations and their work responsibilities in today's academic community.

Although increasing numbers of women have entered academia, their academic status has been slow to improve. Women remain disproportionately represented within instructor, lecturer, and unranked positions: more than 57 percent of those holding such positions are women, according to the AAUP's annual salary survey. In contrast, among full professors, only 26 percent are women, and 74 percent are men. Women remain significantly underrepresented at research institutions; this is in stark contrast to their significant representation at community colleges. The proportion of full-time women faculty at two-year institutions increased from 38 percent in 1987 to approximately 50 percent in 1998.[1] At the same time, among full professors at doctoral institutions, the proportion of faculty members who are women is only 19 percent. A salary advantage held by male faculty members over female faculty members exists at all ranks and institutional types. The salary gap is largest at the rank of full professor where, for all institutional types combined, women are paid, on average, only 88 percent of what their male colleagues are paid.[2] Most important, the percentage of women who hold tenured positions

remains low. The 2000–01 AAUP salary survey reported that among full-time faculty women, only 48 percent are tenured, whereas 68 percent of full-time men are tenured.

The conflict between work and family obligations that many faculty members experience is more acute for women faculty than for men. Giving birth and raising children are distinctive events. Only women give birth, and it is an event that interrupts the career of a higher percentage of professors than any other "physical disability" or family obligation. Eighty-seven percent of women become parents during their working lives.[3] Pregnancy, childbirth, and child rearing are also age-related, and most commonly occur during the same years that college faculty are seeking tenure in their jobs. In 1995 the average Ph.D. recipient was thirty-four years old.[4] Although many men take substantial responsibility for the care of children, the reality is that women still assume more responsibility for child rearing than do men:

> Raising a child takes 20 years, not one semester. American women, who still do the vast majority of child care, will not achieve equality in academia so long as the ideal academic is defined as someone who takes no time off for child-rearing. With teaching, research, committee assignments, and other responsibilities, pre-tenure academics commonly work many hours of overtime. Defining job requirements in this way tends to eliminate virtually all mothers, so it is not surprising the percentage of tenured women in U.S. colleges and universities has climbed so slowly.[5]

Thus, the development and implementation of institutional policies that enable the healthy integration of work responsibilities with family life in academe require renewed attention.

The Association suggests that the following principles and guidelines be used to construct appropriate policies and practices regarding family leaves, modified teaching schedules, "stopping the tenure clock," and institutional assistance for family responsibilities. The policies fall into two categories: (1) general policies addressing family responsibilities, including family-care leaves and institutional support for child and elder care; and (2) more specific policies, such as stopping the tenure clock, that specifically relate to pretenure faculty members who are primary or coequal caregivers for newborn or newly adopted children, responding to the special and age-related difficulty of becoming a parent during the pretenure years.

Transforming the academic workplace into one that supports family life requires substantial changes in policy and, more significantly, changes in academic culture. These changes require a thorough commitment from the leaders of educational institutions as well as from the faculty.[6] No template of policies fits every institution, but it is essential that the priorities, workloads, rewards structure, and values of the academy permit and support an integration of family and work. Without such support, the commitment to gender equity, for both women and men, will be seriously compromised.

Because of the unique characteristics of academic life, particularly the flexibility of schedules, tremendous potential exists for achieving a healthy work-family integration. At the same time, academic culture poses a special challenge. The lack of a clear boundary in academic lives between work and family has, at least historically, meant that work has been all pervasive, often to the detriment of family. As Lotte Bailyn of the Massachusetts Institute of Technology accurately observed:

> The academic career . . . is paradoxical. Despite its advantages of independence and flexibility, it is psychologically difficult. The lack of ability to limit work, the tendency to compare oneself primarily to the exceptional giants in one's field, and the high incidence of overload make it particularly difficult for academics to find a satisfactory integration of work with private life. . . . It is the unbounded nature of the academic career that is the heart

Case 1:06-cv-02025-RJL    Document 1-3    Filed 11/27/2006    Page 54 of 64

of the problem. Time is critical for professors, because there is not enough of it to do all the things their job requires: teaching, research, and institutional and professional service. It is therefore impossible for faculty to protect other aspects of their lives.[7]

As educational institutions seek to support faculty members in integrating work responsibilities and family life, they should recognize that families are varied and that they change in structure and needs over time. Therefore, institutions should adopt policies that contemplate, for example, the existence of blended families created by divorce and remarriage, and policies that include domestic partners, adopted and foster children, and other household members who live in a family group. Administrators and faculty members should be alert to the many forms that discrimination may take against those with a variety of family responsibilities throughout their careers.

## Family-Care and Disability Leaves

Federal and state laws provide for a variety of paid and unpaid leaves for family responsibilities. These legal requirements establish minimum benefits only. The Association encourages institutions to offer significantly greater support for faculty members and other academic professionals with family responsibilities.

### Pregnancy disability leave

Under the federal Pregnancy Discrimination Act of 1978, which is part of Title VII of the Civil Rights Act of 1964, universities as employers must provide the same disability benefits for pregnancy and childbirth as they provide for any other physical disability. If professors are entitled to paid disability leaves under institutional benefit programs, then women professors are entitled to paid pregnancy leaves. Physicians routinely certify six to eight weeks as the physical disability period for a normal pregnancy and birth. Some states, local governments, and, where applicable, collective bargaining agreements, go beyond federal law and require pregnancy disability leaves regardless of the availability of other disability leaves. The AAUP recommends that all educational institutions offer paid disability leaves for pregnancy.

### Family care leave

The federal Family and Medical Leave Act (FMLA) requires employers with fifty or more employees to provide unpaid leave to both women and men for care of newborn or newly adopted infants, or for the care of children, spouses, or parents with serious health conditions. Employees can take up to twelve weeks of FMLA leave within a twelve-month period.

Although the FMLA is an important first step, it is inadequate, because it does not require that such family-care leave be paid, and it fails to provide for leave to care for same-sex or other domestic partners, and other ill family members who are not spouses or parents. In addition, the twelve-week annual time limit may, in certain circumstances, be inadequate. (Some states, local governments, and collective bargaining agreements provide more generous family leave.) The Association encourages both public and private educational institutions to go beyond the minimum coverage prescribed by the FMLA and provide also some form of paid family-care leave. (There are a number of ways institutions may finance the cost of family leave. For example, some institutions provide faculty members with the option of using their paid annual or sick leave concurrently with their unpaid leave.)

### Emergency care and other short-term leave

Family emergencies can be disruptive professionally as well as personally. Nevertheless, they can be accommodated based on familiar models of sick leave. Options include extending sick leave to include leave to care for an ill family member in cases of short-term illnesses not covered by the federal FMLA or other laws. Other alternatives include allowing use of short-term emergency leaves for contingencies connected to unusually adverse weather conditions or other emergency situations, such as the unavailability of usual child- or elder-care services.

**Longer-term leave for child rearing or other family responsibilities**

Institutions frequently grant extended unpaid leaves of absence to faculty members for a variety of purposes.[8] Rearing children should be recognized as one appropriate ground for a leave of absence, and such leaves should be available to both men and women on the same terms and conditions as other unpaid leaves of absence. Other family responsibilities, such as caring for an ailing family member, should also be considered a legitimate reason for allowing unpaid leaves of absence.

The timing and duration of such leaves should be determined by mutual agreement between the faculty member and the administration. Faculty members on family leaves should receive consideration with respect to salary increments, insurance coverage, retirement annuities, and the like, comparable to the benefits available to faculty members on other types of unpaid leaves, such as those for public or private service outside the institution. Individual and administrative obligations connected with such leaves, including the timing of a tenure decision, should be those set forth in the applicable provisions of the AAUP's *Statement of Principles on Leaves of Absence* (1972).

In accommodating the family needs of faculty members, whether through paid or unpaid leaves of absence of short or long duration, institutions should be careful in assigning the duties of the faculty member on leave. To avoid creating resentment among faculty members toward the professor on leave, disproportionate burdens should not be placed on other faculty members.

## Active Service with Modified Duties

Many institutions of higher education have responded to the need for faculty to take care of newborn or newly adopted children by creating modified duty policies to allow faculty to obtain relief from some teaching or service obligations while remaining in active-service status. Active-service status allows faculty members to continue research or other obligations and receive full pay. For example, the University of California system's "active service-modified duties" policy allows faculty partial or full relief from teaching for one quarter (or semester) if the faculty member has "substantial responsibility" for care of a newborn or newly adopted child under the age of five. This period of modified duties is not considered a leave, and the faculty member receives full pay.[9] Other universities allow faculty to reduce semester- or year-long teaching loads for child-care purposes with proportional reductions in pay.[10]

In 1974 the AAUP recommended in *Leaves of Absence for Child-Bearing, Child-Rearing, and Family Emergencies* that "[t]he alternative of temporarily reduced workload should be available to faculty members with child-rearing responsibilities." Subsequently, in 1987 the AAUP recognized in *Senior Appointments with Reduced Loads* the importance of "policies and practices that open senior academic appointments to persons with reduced loads and salaries without loss of status." The statement acknowledged that such "[m]odified appointments would help meet the special needs of individual faculty members, especially those with child-rearing and other personal responsibilities." The AAUP now recommends that the possibility of appointments with reduced loads be extended to all full-time faculty members, irrespective of their tenure status. The AAUP encourages institutions to explore the possibility of adopting policies providing for short-term periods of modified duties at full pay for family

*National Assoc*
*Women Fac*

responsibilities.

## The Tenure Clock

The resolution of pretenure family-work conflicts is critical to ensuring that academic opportunities are truly equitable. Such conflicts often occur just when the research and publication demands of the tenure process are most onerous, and when many faculty members have responsibilities for infants and young children. Institutions should adopt policies that do not create conflicts between having children and establishing an optimal research record on the basis of which the tenure decision is to be made.

Tenure remains a fundamental requirement for protecting academic freedom. The administration and the faculty of an institution must determine the specific academic standards governing the tenure decision at their institution. Academic standards, however, can and, in this instance, should be distinguished from the amount of time in which an institution's academic standards can be met.[11] Specifically, institutions should allow flexibility in the time period for achieving tenure to enable faculty members to care for newborn or newly adopted children.

A probationary period of seven or fewer years allows faculty members to establish their record for tenure. Historically, this probationary period was based on the assumption that the scholar was male and that his work would not be interrupted by domestic responsibilities, such as raising children. When the tenure system was created, the male model was presumed to be universal. [12] It was assumed that untenured faculty—whether men or women—were not the sole, primary, or even coequal caretakers of newborn or newly adopted children. [13] An inflexible time factor should not be used to preclude women or men who choose to care for children from pursuing tenure within a reasonable period of years. One study found that 80 percent of "leadership campuses" enable faculty members to exclude a certain amount of probationary time for specific reasons, such as the birth or adoption of a child.[14]

The 1974 AAUP statement *Leaves of Absence for Child-Bearing, Child-Rearing, and Family Emergencies* provided for "stopping the tenure clock" for purposes of child bearing or rearing when a professor takes a full or partial leave of absence, paid or unpaid. The AAUP now recommends that, upon request, a faculty member be entitled to stop the clock or extend the probationary period, with or without taking a full or partial leave of absence, if the faculty member (whether male or female) is a primary or coequal caregiver of newborn or newly adopted children.[15] Thus, faculty members would be entitled to stop the tenure clock while continuing to perform faculty duties at full salary. The AAUP recommends that institutions allow the tenure clock to be stopped for up to one year for each child, and further recommends that faculty be allowed to stop the clock only twice, resulting in no more than two one-year extensions of the probationary period.[16] These extensions would be available whether or not the faculty member was on leave.

In extending the probationary period in recognition of the time required for faculty members to care for newborn or newly adopted children, institutional policies should clearly provide that the tenure candidate be reviewed under the same academic standards as a candidate who has not extended the probationary period. [17] Institutions should guard against imposing greater demands on a faculty tenure candidate as a consequence of his or her having extended the absolute time from the year of appointment to the year of tenure review.[18] To ensure that any modification of the probationary time limits does not create or perpetuate historic gender discrimination, administrations should monitor tenure decisions to ensure that different standards are not imposed in practice through the application of policies that appear neutral. Institutions should also take care to see that faculty members are not penalized in any way for requesting and receiving extensions of the probationary period.

When a faculty member requests and receives an extension of the probationary period, the appropriate university official should clearly inform the faculty member, in writing, that existing academic standards will govern the future tenure decision. Administrators and faculty members are encouraged to disseminate the stop-the-tenure-clock policy widely, and to monitor the policy's use by both women and men.

The stopping of the tenure clock should be in the form of a clear entitlement under institutional policies, rather than in the form of an individually negotiated agreement or informal practice. Written employment policies designed to support the raising of children should not create a separate "track" that may stigmatize faculty members. Studies of junior tenure-track faculty indicate that the pressures result not only from time demands created by conflicting responsibilities, but also from uncertain or conflicting expectations on the part of senior faculty concerning the standards for tenure. On some campuses, an implicit model of total dedication still exists, requiring faculty members to demonstrate that work is one's primary, even sole, commitment. Such expectations must be clarified and modified to recognize the realities of the lives of faculty members who wish to raise children while pursuing an academic career.[19]

## Additional Institutional Support

### Child care

Although many institutions recognize the need for child care, fewer offer or subsidize it.[20] The AAUP recommends an institutional commitment to the provision of quality child care for the children of faculty and other academic professionals. As with other benefits, recommendations on the extent and form of such institutional support (whether through subsidized on-campus care or through a benefit plan) should be sought from an appropriate body of the faculty in consultation with other groups on campus, such as staff and students.

Child care is an issue for both men and women. The AAUP believes that for faculty members with child-rearing responsibilities to participate successfully in teaching, research, and service to their institution, they must have access to quality child-care facilities. Furthermore, the availability of child care is a crucial issue in recruiting and retaining faculty. Employers in and out of academe have found that the provision of on-site facilities has led to stronger and more contented families and increased productivity.[21] Some of the benefits that accrue for faculty parents from child-care arrangements on campus include the ability to be reached easily in an emergency, the time and money saved in transportation, and the opportunity to share an occasional lunch or other daytime activity with their children. Faculty members derive peace of mind from knowing that their children are receiving quality care and that the facility has long-term stability. If the institution has an early childhood education program, the opportunity to use the facility for training students provides an additional benefit and contributes to high standards of child care.

Universities and colleges should assume a share of the responsibility for the provision of child-care services. Some institutions, because of their size or other considerations, may choose not to support on-site child care. Such institutions should explore alternatives, such as cooperative arrangements with other nearby employers, resource and referral services, and financial assistance.

### Elder and other family care

Increasingly, faculty members are called upon to care for elderly parents and other family members.

Case 1:06-cv-02025-RJL    Document 1-3    Filed 11/27/2006    Page 58 of 64

This tends to be more characteristic of mid-career or senior faculty than of junior faculty.[22] Some faculty members may also be "sandwiched" between responsibilities for children and parents at the same time.

Just as the Association recommends an institutional commitment to providing quality child care, it also strongly recommends an institutional commitment to supporting faculty members in providing quality care to elderly parents or to other family members. Colleges and universities should consider affording financial support to faculty members to cover expenses necessary to allow family members to attend existing centers and programs that provide for elder care or the care of family members with special needs. Institutions should consider providing benefit plans that afford faculty members various options in meeting their family responsibilities.

**Flexible work policies and schedules**

In addition to formal leave policies, faculty members and academic professionals should have flexibility in scheduling to enable them to respond to family needs as they arise. Flexible work policies allow faculty members to participate in a child's scheduled school activities or to handle the conflicts between school and academic calendars. Colleges and universities should, to the extent possible, coordinate academic-year calendars with other local educational institutions, or provide child-care support when conflicts occur.[23]

Both child and other family-care needs of faculty members should be included among the many legitimate considerations in scheduling classes, meetings, and other faculty obligations.[24] Likewise, institutional financial support for the expenses of providing substitute care should be considered when faculty members attend professional conferences.

Conclusion

Because institutional policies may be easier to change than institutional cultures, colleges and universities should monitor the actual use of their policies over time to guarantee that every faculty member—regardless of gender—has a genuine opportunity to benefit from policies encouraging the integration of work and family responsibilities. The goal of every institution should be to create an academic community in which all members are treated equitably, families are supported, and family-care concerns are regarded as legitimate and important.

A more responsive climate for integrating work and family responsibilities is essential for women professors to participate on an equal basis with their male colleagues in higher education. Recognizing the need for broader and more inclusive policies represents a historic moment of change. The Association encourages both women and men to take advantage of legal and institutional change so that all faculty members may participate more fully in the care of their children, and may provide the necessary care for parents and other family members.

Endnotes:

1. Robin Wilson, "Percentage of Part-Timers on College Faculties Holds Steady after Years of Big Gains," *Chronicle of Higher Education,* 23 April 2001. Back to text.

2. Marcia Bellas, *AAUP Faculty Salary and Faculty Distribution Fact Sheet, 2000–01* (April 2001), <www.aaup.org/Wbellas.htm>. Back to text.

3. Jane Waldfogel, "The Effect of Children on Women's Wages," *American Sociological Review* 62 (1997): 209. Similarly, 81 percent of men become fathers at some point in their lives. See Nancy E. Dowd, *Redefining Fatherhood* (New York: New York University Press, 2000), 22. Men, however, do not give birth, and some become fathers at later ages, some even after retirement. Back to text.

4. Robert Drago and Joan Williams, "A Half-Time Tenure-Track Proposal," *Change* (November–December 2000): 47–48. Back to text.

5. Ibid. Back to text.

6. Cornell University provides an example of such an institutional commitment: "Cornell University is committed to policies, practices, and programs supportive of the members of its diverse community as they traverse the interlocking worlds of work and family. The University encourages, at all levels, an environment which is supportive of and sensitive to the needs and mutual dependence of the workplace and working families." See <www.ohr.cornell.edu/_ohr/life/life57d_workfampolicy.html>. Back to text.

7. Lotte Bailyn, *Breaking the Mold: Women, Men, and Time in the New Corporate World* (New York: Free Press, 1993), 51. Back to text.

8. This section incorporates portions of the text of the AAUP's 1974 *Leaves of Absence for Child-Bearing, Child-Rearing, and Family Emergencies.* Back to text.

9. Similarly, the School of Science at the Massachusetts Institute of Technology provides that the school "will normally offer a one-semester release from teaching and administrative activities at full pay to faculty members who act as the primary caretaker at home for a new child." The University of Michigan also provides for "modified duties for childbearing," which enable a faculty member to recover fully from the effects of pregnancy and childbirth by allowing a pregnant faculty member, on request to her dean, [to] be granted a period of modified duties without a reduction in salary. At a minimum, modified duties means relief from direct teaching responsibilities for the academic term that includes the actual sick leave time the faculty member expects to take in connection with the birth. This policy is available to non-tenured as well as tenured faculty, but is available only in conjunction with pregnancy or childbirth. The tenure clock is not stopped during the period of modified duties unless the faculty member also has an appointment of less than 80 percent during the time she is on modified duties. Back to text.

10. For example, the Wayne State University AAUP-AFT collective bargaining agreement (1999b–2002) provides for modified duty assignments at full or partial pay, depending on whether a full or reduced teaching load is arranged. Back to text.

11. The AAUP statement *On Crediting Prior Service Elsewhere as Part of the Probationary Period* (1978) recognizes that "in specific cases the interests of all parties may best be served through agreement at the time of initial appointment to allow for more than four years of probationary service at the current institution (but not exceeding seven years), whatever the prior service elsewhere." Just as adjustments may be made to the probationary clock regarding prior service, so, too, should institutional policies allow for adjustment of the probationary period for the "specific cases" of faculty members who are primary or coequal caregivers to newborn or newly adopted children. Back to text.

12. As Susan Kolker Finkel and Steven G. Olswang have noted, the traditional tenure system was based on a model designed for men who were professors with wives at home caring for children. See Finkel and Olswang, "Child Rearing as a Career Impediment to Women Assistant Professors," *Review of*

*Higher Education* 19 (1996): 130. Accordingly, few of the early women professors married or had children. See Jessie Bernard, *Academic Women* (University Park, Pa.: Pennsylvania State University Press, 1964). In 1973 the Carnegie Commission on Higher Education wrote:

Probably the most serious handicap facing married women desirous of a teaching career in higher education, especially in research-oriented universities, is that in the very age range in which men are beginning to achieve a reputation through research and publication, 25 to 35, married women are likely to be bearing and rearing their children.

*Opportunities for Women in Higher Education; Their Current Participation, Prospects for the Future, and Recommendations for Actions* (New York: McGraw Hill, 1973), 139–40. Back to text.

13. Nor did the traditional tenure system take into account the increased likelihood of medical problems associated with delayed childbirth or the age-related obstacles to adoption. See Amy Varner, "The Consequences and Costs of Delaying Attempted Childbirth for Women Faculty" (2000) and Joan Yang, "Adoption Issues for Faculty" (2000), <http://lsir.la.psu.edu/workfam/faculty&families.htm>.

In 1995 the median age for the completion of a Ph.D. was thirty-four, which places the age of tenure at around forty and thus, "[a]sking women to delay having children until such a late age seems unfair and unkind, and involves health and infertility risks." Drago and Williams, "A Half-Time Tenure-Track Proposal."

A recent University of Michigan report found that the university's "women assistant professors were more likely than men either to have children prior to beginning their academic careers or to delay child bearing and rearing until after they receive tenure or until they are well established in their careers." *University of Michigan Faculty Work-Life Study Report* (Ann Arbor, Mich.: Regents of the University of Michigan, 1999), 18.

In a survey of 124 women assistant professors in 1996, 43 percent viewed time required by children as a serious impediment to tenure; among those with children under age six, the figure rose to 82 percent. Finkel and Olswang, "Child Rearing as a Career Impediment to Women Assistant Professors," 133. Back to text.

14. "Leadership campuses" are defined as the ninety-four campuses that were in the top 25 percent of respondents to a survey on "family-friendly" policies conducted by the College and University Personnel Association (CUPA). The report found that "these policies were put into effect in order to recognize that circumstances beyond the faculty member's control may hinder the performance of responsibilities such as teaching, research, and service to the school or community." Dana E. Friedman et al., *The College and University Reference Guide to Work-Family Programs* (Washington, D.C.: CUPA Foundation, 1996), 120. Back to text.

15. A growing number of institutions of higher learning already provide policies that extend the pretenure clock without requiring the faculty member to be on leave. For example, the University of Michigan faculty handbook provides for automatically stopping the tenure clock upon faculty request for up to one year for child rearing: "The one-year exclusion for pregnancy, childbirth, and related medical conditions is automatic on request, but requests must be made prior to the initiation of the tenure review." Similarly, the University of California policy provides that "the Chancellor may grant to a faculty member who has substantial responsibility for the care of a newborn child or newly adopted child under the age of five up to one year off the tenure clock for each birth or adoption, provided that all time off the tenure clock totals no more than two years. . . . [T]he campus will accept no requests to

stop the tenure clock after the tenure review has begun." Back to text.

16. One survey found that of those higher education institutions that offer "stop-the-tenure-clock" policies, "nine out of ten allow the exclusion of up to two semesters." See Friedman et al., *The College and University Reference Guide to Work-Family Programs.* The University System of Georgia recently amended its board of regents policies on tenure to "enhance the family-friendly work environment." In so doing, it adopted a stop-the-tenure-clock policy that provides that "the total time granted for suspension of the tenure clock . . . shall not ordinarily exceed two years." Back to text.

17. Institutions should inform external reviewers that the candidate's probationary period has been extended under institutional policy and that the candidate's record should be reviewed as if he or she had only the normal probationary period.Back to text.

18. The 1997–2000 Master Agreement between Northern Michigan University and the university's AAUP chapter provides that "the taking of [family] leave shall not otherwise prejudice future tenure or promotion consideration." Similarly, Pennsylvania State University's policy provides that a "staying of the provisional tenure period should not penalize or adversely affect the faculty member in the tenure review." In addition, the University of Wisconsin policy provides that if "the faculty member has been in probationary status for more than seven years, the faculty member shall be evaluated as if he or she had been in probationary status for seven years, not longer." Back to text.

19. Similar requests should be considered during the pre-tenure period. So, for example, requests by tenure-track candidates to extend the time peiod for a third-year review, because of the birth or adoption of a newborn child for whom he or she is the primary or coequal caregiver, should be considered and, if granted, clearly documented so that the candidate is reviewed under the proper standard.Back to text

20.This section incorporates the substance and most of the text of AAUP's 1989 statement *Faculty Child Care*Back to text..

21. In 2001 there were approximately 2,500 campus-based child care centers in the United States, according to the National Coalition for Campus Children's Centers. Back to text.

22. Elder-care responsibilities appear to fall most heavily on tenured professors, especially tenured women faculty. Thirty-seven percent of employees who assume elder-care responsibilities are fifty or older. See James T. Bond, Ellen Galinksy, and Jennifer E. Swanberg, *1997 National Study of the Changing Workforce* (New York: Families and Work Institute, 1997).

According to the National Academy on Aging, 72.5 percent of all informal caregivers are women. See Amy Varner and Robert Drago, "The Changing Face of Care: The Elderly" (2000), <http://lsir.la.psu.edu/workfam/faculty&families.htm>. Accordingly, career advancement may be jeopardized by such caregiving responsibilities, including the continued advancement of women faculty. See M. M. Robinson, B. L. Yegidis, and J. Fun, *Faculty in the Middle: The Effects of Family Caregiving in Universities,* Wellesley College Center for Research on Women, Working Paper 296 (Wellesley, Mass., 1999). Back to text.

23. The University Park campus of Pennsylvania State University and the town of State College, for example, coordinate their spring breaks to enable faculty parents to care for their children during the break. See *Final Report to the Alfred P. Sloan Foundation,* Pennsylvania State University, Work-Family Working Paper 01-01 9 (State College, Pa., 2001). Back to text.

Case 1:06-cv-02025-RJL     Document 1-3     Filed 11/27/2006     Page 62 of 64

24.A 1996 study found that two-thirds of women and close to one-third of men experienced family difficulties when faculty meetings were scheduled after 5 $_{P.M.}$ on weekdays or during the weekend. See Linda P. Fried et al., "Career Development for Women in Academic Medicine," *Journal of the American Medical Association* 898 (1996).Back to text.

American Association of University Professors, 1012 Fourteenth Street, NW, Suite #500; Washington, DC 20005
202-737-5900 Fax: 202-737-5526
AAUP Home Page | Contact Us | Join AAUP


EXHIBIT

# American Association of University Professors

**Tenure Clock**        **Leave Policies**        **Bibliography**

AAUP Statement on
Work and Family

**Services Offered:**
  Workshops
    Policy Resources

Committee on
Women in the
Academic Profession

Contact Us

Back to Balancing
Family and
Academic Work
homepage

# Balancing Family and Academic Work

## Policy Resources

In November 2001, The Council of the American Association of University
Professors adopted as AAUP policy, the *Statement of Principles on Family
Responsibilities and Academic Work*, which addresses the dilemma faced by
junior faculty members whose years of probationary service coincide with a
time when they might become new parents. The AAUP statement contends
"the goal of every institution should be to create an academic community in
which all members are treated equitably, families are supported, and family-
care concerns are regarded as legitimate and important." The statement seeks
to familiarize faculty and administrators with the eligibility requirements for
federal Family and Medical Leave Act (FMLA) benefits. The statement
contains policy recommendations that fall into two categories: (1) general
policies addressing family responsibilities, including family-care leaves and
institutional support for child and elder care; and (2) more specific policies,
such as stopping the tenure clock, that specifically relate to probationary
faculty members who are primary or co-equal caregivers for newborn or
newly adopted children. The Association's overall goal is to develop a more
responsive and flexible workplace for faculty with family obligations,
[particularly mothers,] and to promote options for viable career paths for
contingent faculty, [particularly women,] while maintaining the integrity of
faculty work and the quality of education.

## Specific Recommendations from the AAUP *Statement of Principles on Family Responsibilities and Academic Work*

- *Paid leaves* should be provided for pregnancy, family care, and
  emergencies with the option of longer-term unpaid leaves depending
  upon the circumstances.

- *Active Service with Modified Duties* - Faculty members should have the
  option of a reduced workload, without loss of status, to handle family
  responsibilities.

- *Stopping the Tenure Clock* - Faculty members should have the option
  to extend the probationary period up to two years following the birth or
  adoption of a child. The option of stopping the tenure clock should be
  provided with or without a leave of absence. Tenure decisions should
  be made according to the same criteria (not higher expectations). The
  tenure clock should be stopped upon request and not be considered a
  matter for special negotiation.

Case 4:06-cv-02025-RJL    Document 1-3    Filed 11/27/2006    Page 64 of 64

- Universities should establish and communicate formal institutional policies rather than make individual ad hoc arrangements.

## *Statement of Principles on Family Responsibilities and Academic Work*

(Posted 11/03)

---

American Association of University Professors, 1012 Fourteenth Street, NW, Suite #500; Washington, DC 20005
202-737-5900 Fax: 202-737-5526
AAUP Home Page | Contact Us | Join AAUP